## THE STATE v. ROBERT MILLER, Appellant.

### Division Two, March 30, 1915.

STATEMENTS MADE AT CORONER'S INQUEST: Irrelevant Objection: Rule as to General Objection Applied. The rule that a general objection to proffered testimony will not authorize its consideration on appeal should be applied with equal force to an irrelevant objection. An objection that witnesses should not be permitted to testify to the statements made by defendant at the coroner's inquest, for that his statements had not been reduced to writing as required by the statute, was an irrelevant objection, since the question for decision was not as to the irregularity of the inquest, but as to the admissibility of testimony as to defendant's statements, and therefore the objection was the same as no objection.

2. ————: Voluntary. A statement made by defendant at the coroner's inquest, if voluntarily made, is admissible in evidence at his trial; and where, before testifying at the coroner's inquest, he was informed by the prosecuting attorney that any statements made by him in his examination could be used against him on his trial and that he was not required to incriminate himself, his statements then made were voluntary in a legal sense and are admissible in evidence.

3. MURDER: Circumstantial Evidence. There is no hard-and-fast rule upon which to base a conclusion in cases dependent for their facts on circumstantial evidence, except there must not be a total failure of evidence showing guilt, nor such a chain of weak and disconnected circumstances as to justify an inference that the verdict is the result of passion, prejudice or partiality; but even in a murder case, where the evidence is circumstantial, if it is sufficient to meet each element of the

rule, namely, that the circumstances proved must be consistent with each other and with the hypothesis that the accused is guilty, and so inconsistent with every presumption of innocence as to exclude every conclusion except that of guilt, and if such substantial facts have been shown as authorize a conclusion of guilt, the Supreme Court on appeal will not interfere, whether the defense be *alibi* or insufficiency of the evidence.

4. **JUROR: Test of Qualifications.** The test as to the qualifications of a juror is his freedom·from prejudice and his consequent ability to give the accused a fair and impartial trial.

5. **APPEAL: Short Method.** The filing of a short form of transcript in a criminal case is without any authority of law governing appeals and accomplishes nothing in behalf of an appellant.

Appeal from Reynolds Circuit Court.—*Hon. É. M. Dearing*, Judge.

AFFIRMED.

*John H. Keith* and *O. L. Munger* for appellant.

(1) Testimony, taken at a coroner's inquest of one who is afterwards prosecuted for the homicide is inadmissible against him, where he acted without counsel and was at the time suspected of having committed the crime, and the examination was made to obtain criminating circumstances against him. State v. Young, 119 Mo. 495; People v. Mondon, 103 N. Y. 211; People v. McMahon, 15 N. Y. 384; State v. Thomas, 250 Mo. 212; State v. Thornton, 245 Mo. 436; Art. 2, sec. 23, Constitution; Josephine v. State, 39 Miss. 613; Counselman v. Hitchcock, 142 U. S. 547. (2) The burden is upon the State to prove defendant's presence at the time and place of the crime beyond a reasonable doubt. And if the evidence of defendant's alibi created in the minds of the jury a doubt as to his presence at the time of the commission of the crime, he should have been acquitted. State v. Shelton, 223 Mo. 118; State v. Glasscock, 232 Mo. 278; State v. Barton, 214 Mo. 216; State v. Lewis, 69 Mo. 92; State v. Taylor,

118 Mo. 153. (3) One who has talked to witnesses who detail what the evidence was at an inquest is not competent as a juror. State v. Hultz, 106 Mo. 41; State v. Bryant, 93 Mo. 273; State v. Culler, 82 Mo. 625.

*John T. Barker,* Attorney-General, and *Thomas J. Higgs,* Assistant Attorney-General, for the State.

(1) Voluntary statements of the defendant, made when a witness at the coroner's inquest, are properly admitted in evidence. State v. Thomas, 250 Mo. 212; State v. Thornton, 245 Mo. 436; State v. Marion, 235 Mo. 359; State v. Young, 119 Mo. 495; State v. Wisdom, 119 Mo. 551; State v. Mullins, 101 Mo. 518; People v. Kelley, 47 Cal. 125. (2) There was no reasonable doubt of the defendant's presence at the time of the commission of the crime. The jury were properly instructed as to the defense of alibi. State v. Glasscock, 232 Mo. 294; State v. Shelton, 223 Mo. 137; State v. Barton, 214 Mo. 316; State v. Cushenberry, 156 Mo. 168; State v. Bryant, 134 Mo. 252. (3) Where a juror on his *voir dire* examination declares that his opinion is not such as to bias or prejudice his mind, and that his opinion will readily yield to the evidence in the case, he is a competent juror. State v. Schumeback, 243 Mo. 538; State v. Church, 199 Mo. 629; State v. Darling, 199 Mo. 188; State v. Sykes, 191 Mo. 75; State v. Brennan, 164 Mo. 507; State v. Bronstine, 147 Mo. 520; State v. McGinnis, 158 Mo. 105. The ground upon which a juror is challenged must be stated. Simply objecting to a juror as being disqualified is not sufficient. State v. Bobbitt, 215 Mo. 44; State v. Taylor, 134 Mo. 142; State v. Reed, 137 Mo. 132; State v. McGinnis, 158 Mo. 118; State v. Evans, 161 Mo. 108; State v. Myers, 198 Mo. 247; State v. Dipley, 242 Mo. 474. (3) Sufficiency of the evidence. State v. Concelia, 250 Mo. 411; State v. Bass, 251 Mo. 107. .

WALKER, J.—An information filed by the prosecuting attorney of Reynolds county charged the appellant, Robert Miller, with murder in the first degree in having shot and killed Richard Mallow. Upon a trial appellant was convicted as charged and his punishment assessed at imprisonment for life in the penitentiary. From that judgment he appeals to this court.

Richard Mallow, the deceased, was a single man between fifty and fifty-five years of age. He had no permanent home, but lived at times with his brother-in-law, John Gallahar, near the village of Black in Reynolds county, and at other times with other relatives or friends in the neighborhood. When the weather permitted he camped in the woods and hunted for several days at a time. He lived, as the witnesses state in homely but expressive phrase, "very poorly," was exceedingly parsimonious, although his pecuniary condition would have enabled him to live differently, as it had been generally known in the neighborhood for years that he carried on his person a roll of paper money consisting of bills of large denominations aggregating not less than $800. On August 27, 1913, Mallow came to the blacksmith shop of his brother-in-law, John Gallahar, at about two o'clock in the afternoon, with a double-barreled shotgun which he carried when hunting, and asked for and was given some loaded shells or cartridges, and left, as he said, to go squirrel hunting. This was the last time he was seen alive. About an hour after he left, a daughter of Gallahar's hearing two shots fired in the direction in which Mallow had gone, remarked, "Uncle has killed a squirrel." Two weeks elapsed, but Mallow did not return. His absence and no word having been received from him, did not occasion anxiety, because from his habits it was reasonably concluded that he was either camping out or staying elsewhere in the neighborhood. On the 10th day of September, 1913, Hendrix, a son of John Gallahar, while hunting cattle discovered the dead

body of a man in the woods about half a mile from his father's home. He did not go nearer the body than twenty-five or thirty yards, but ran home and informed his father of his discovery. The father and son went immediately to the spot and discovered the body to be that of Richard Mallow. The neighbors were notified, and several men went at once and also identified Mallow's body. His gun, not loaded, was standing five or six feet from the body, leaning against a tree. Physicians testified that Mallow had been dead from ten days to two weeks. Decomposition was somewhat advanced, but the body was in a sufficient state of preservation to enable it to be determined that there was a gunshot wound on the left side of the neck back of the lower lobe of the ear. This wound ranged forward to the right and upwards, and the shot or shots in their exit had torn and lacerated the right side of the face. The doctors stated that the wound was sufficient to produce immediate death.

The appellant, Robert Miller, was a young married man, having a wife and two children, and living in the town of Lesterville in Reynolds county, not many miles distant from the village of Black. Miller had no money or property and was dependent upon his daily labor for the support of himself and his family. The total amount of property returned by him for taxation was $30. In the early part of August, 1913, he had been employed by the Hub Mill Company in the neighborhood to drive a team. For several weeks before August 27, 1913, he was at work for a man named Brown, stacking lumber and railroad ties. When employed it was his custom to draw his money in advance. About eight or nine o'clock on the morning of August 27, 1913, Miller came to a blacksmith shop in Lesterville, borrowed a double-barreled shotgun and some cartridges, and stated that he was "going up the creek hunting." He was seen a short time thereafter about a mile northwest of Lesterville on the road leading to the village

of Black going through the field of one of the witnesses with a gun on his shoulder. He asked a boy named Senceboy to accompany him. The latter declined, and he went on his way in the direction of the village of Black. The next time he was seen was on the 28th of August, 1913, in a barbershop at Lesterville. It was about nine o'clock in the morning. He said that he was not well and that he had had a chill and had gone up Camp Meeting Hollow the day before and had been there the most of the day. Nothing was said about where he was during the night of the 27th. Camp Meeting Hollow was about two and one-half miles from John Gallahar's home. A witness named Rayfield, who lived next door to Miller in Lesterville, saw him at his home on the morning of the 27th, but did not see him during the remainder of the day. Prior thereto Miller was never known to have any ready money. At a picnic held near Lesterville on the 29th day of August, 1913, he contracted to buy a pair of mules from a witness named Carty, and paid him $10 to bind the bargain. The next morning, Saturday August 30th, Carty brought the mules and delivered them to Miller, who paid $510 in cash for them. The money paid by Miller to Carty consisted of one $100 bill, the balance being in twenties and tens. Carty deposited this money in the Reynolds County Bank at Centerville, and on the trial the $100 bill was exhibited to him and he testified that it was one of the bills that had been given him by Miller. A short time after Mallow's body was found, a witness named Alcorn went with Miller to Ironton and from there to Piedmont. In a conversation with Miller, Alcorn said to him: "Where did you get the money you paid for those mules?" To which Miller replied, "Don't you know I always have money?" Witness said, "Well, I didn't know it;" and Miller said, "Why do you ask?"; and the witness said, "Because I need a hundred or two, and if you have been able to borrow money from the banks I would

like to know how you got it.   I need some money to buy
a new wagon.''   Whereupon Miller said, ''I will loan
it to you.   I have had some money all the time.   Don't
you know I worked in St. Louis for a street car com-
pany and drove team for the Hub Mill Company and
such like that?''   Just before they started home from
Piedmont and while in the depot waiting for a train,
Miller said to Alcorn, ''If you want that money I had
just as well give it to you one time as another,'' and
thereupon he handed Alcorn $100.   Alcorn offered to
give security, but Miller said it was not necessary and
did not take or ask for a note.

At the picnic where Miller contracted for the mules
he paid one William, George $6.50 in discharge of a
debt.   He had told George two weeks before that he
could not pay him because he had no money.   On the
same day, while at the picnic, Miller paid Lincoln Shy
$10 he owed him.   Shy did not ask him for the money,
as it was the general opinion that Miller had no money
to amount to anything.   In the month of June, 1913,
while Miller was employed by the Hub Mill Company,
he made inquiry of a witness named Rayfield concern-
ing Mallow.   Among other things, referring to Mallow,
Miller said: ''He is supposed to carry a right smart
of money?''   Rayfield replied, ''I don't know now;
twenty-five years ago I counted it and he then had over
$800.''   Miller said, ''Why don't you kill him for it?''
Rayfield replied, ''I couldn't kill a man for his money;
I couldn't kill that old man for his money; I don't
get my money that way.''   To this Miller said, ''By
God, if this Hub mill goes to Clayton Creek I will do
it, and if you don't think so you are damn badly
fooled.''   Subsequently the Hub mill was moved to
Clayton Creek, four or five mills from where John
Gallahar resided, and Miller assisted in the removal
and worked there afterwards.   In going from Lester-
ville, where he resided, to the mill after its removal, it
was necessary for him to pass John Gallahar's.   In

going to and from his work Miller stopped several times at Gallahar's residence, and in conversation with a son of the latter said: "I have been told that old Richard Mallow has a lot of money, something like a thousand dollars." Young Gallahar replied, "No, I don't think he has that much, but he has some money." Miller said, "Does he camp out very much?" to which young Gallahar replied, "Something like half the time." This conversation occurred in the early part of the month in which Mallow is alleged to have been killed. At the time the autopsy was held on the body of Mallow, from the 9th to the 11th of September, 1913, the prosecuting attorney, after cautioning Miller that anything he said would be used against him on a trial, asked him where he got the money he had been spending. He stated that he had gotten $120 from a street railway company in St. Louis and that he had a pair of mules, and that he had sold the mules, harness and wagon for $150. That the balance had been earned by him while working for the Hub Mill Company. That the total amount of money he had at any one time was $520 and some pocket change. That he bought some mules for $510 with this money. He denied that he had loaned Mr. Alcorn $100; and stated that the total amount of money he had spent was $510 for the mules, $5 for a saddle, $5 or $7 paid William George and $10 paid on a grocery bill in Lesterville. His testimony in regard to the amount of money he had was in no manner corroborated except in regard to $10 spent for groceries, which he claimed was paid him by Brown, for whom he last worked. He denied that he had ever threatened to kill old man Mallow, as stated by the witness Rayfield, or that he had made inquiry of young Gallahar in regard to Mallow's money. Several witnesses testified that they saw Miller at his home in Lesterville between six and six thirty o'clock p. m. on the 27th of August, and one witness stated that at one or two o'clock on August 28th

he saw Miller at the blacksmith shop where he borrowed
the shotgun. On cross-examination these witnesses
were not certain as to the exact date when they saw
Miller. His testimony as to his whereabouts is that
he was in Lesterville on the evening of the 27th of
August and left the residence of one Albert Johnson
about eight o'clock in the evening and went home.
Arriving there he retired and was not away from home
during the night. His testimony was corroborated by
that of his wife. Miller on the trial did not testify as
to where he obtained the money he had been spending
in the purchase of the mules and the paying of other
bills.

It is contended that error was committed, (1) in
the admission at the trial of testimony given by appel-
lant at the coroner's inquest; (2) in the refusal of
appellant's demurrer to the evidence at the close of the
State's case; and (3) in not sustaining appellant's
challenges to certain jurors.

I. *Defendant's Statements at Inquest.*—Witnesses
for the State were permitted to testify as to statements
made by the defendant under oath at the coroner's in-
quest. The objection to this testimony, as preserved
in the record, was that defendant's statements had not
at the inquest been reduced to writing as required by
section 2934, Revised Statutes 1909. The question in-
volved was not as to the irregularity of the inquest,
but the admissibility of the testimony as to defendant's
statements. Time and again it has been announced
that specific and pertinent objections must be made
to testimony, first, to enable the trial court to rule in-
telligently thereon, and, second, to authorize a review
on appeal.

The rule as to a general objection may be applied
with equal force to an irrelevant objection, in that it
is no objection and hence not entitled to be considered.

While not so preserved as to constitute an assignment of error, it is not inappropriate to say that the test as to the admissibility of this character of testimony is no longer whether it was made in a judicial proceeding under oath, but, was it voluntary? If so, then it is admissible, otherwise not. This rule is clearly announced in State v. Wisdom, 119 Mo. l. c. 551, in which earlier cases declaratory of the same doctrine are cited and discussed. Later cases than that of State v. Wisdom, supra, for example, State v. Thomas, 250 Mo. 189, and State v. Thornton, 245 Mo. 436, while seeming to announce in general terms a different doctrine, will be found upon examination to present facts which clearly show that the statements made therein were not voluntary.

The facts in the instant cause are that the defendant, before testifying at the inquest, was informed by the prosecuting attorney that any statements made by him in his examination could be used against him on the trial and that he was not required to incriminate himself. Armed with this information he made the statements objected to, which related mainly to an attempt to explain where he obtained the money he had recently theretofore been spending and not to the facts immediately concerning the crime. The charges made but not properly preserved for our consideration in regard to defendant's statements, if prejudicial, were given under such circumstances as to not constitute error.

II. *Alibi and Sufficiency of Evidence.*—The jury heard all of the testimony and evidently did not believe the witnesses who testified as to the presence of the defendant in the town of Lesterville during the time when all of the circumstances pointed to the assassination of Richard Mallow.

The evidence in this case was circumstantial. It was sufficient to meet the requirements of the rule that

State v. Miller.

the circumstances proved must be consistent with each other and with the hypothesis that the accused was guilty, and so inconsistent with any reasonable presumption of innocence as to exclude every conclusion except that of guilt. While there is no hard-and-fast rule upon which to base a conclusion in cases dependent for their facts upon circumstantial evidence, yet where, as in this case, the defendant's innocence can only be made to rest upon an unreasonable hypothesis, and such facts have been shown as to authorize a conclusion of guilt, we are not authorized in interfering with the finding of the jury, there not being a total failure of evidence or such a chain of weak and disconnected circumstances as to authorize an inference that the verdict was the result of passion, prejudice or partiality. We therefore decline to interfere with the verdict of the jury. [State v. Concelia, 250 Mo. 411; State v. Bass, 251 Mo. 107.]

III. *Challenges of Jurors.*—It is contended that the trial court erred in not sustaining challenges to jurors who, it was claimed, had talked with witnesses and had therefrom formed opinions as to the guilt or innocence of the defendant. The transcript of the record does not sustain this contention. None of the facts elicited upon the *voir dire* examination sustain defendant's assignment that any juror had talked with a witness or was in any manner biased or prejudiced against the defendant so as to prevent the juror from giving him a fair trial under the evidence and in accordance with the law as declared by the court. The test as to the qualification of a juror is his freedom from prejudice and his consequent ability to give an accused a fair and impartial trial. There is nothing in this case to indicate that any juror did not possess these necessary qualifications. Defendant's contention, therefore, in this regard is held to be without merit.

IV. *Short Transcript.*—A short form of transcript was filed in this case; the filing of same is without any authority of law governing appeals in criminal cases and accomplishes nothing in behalf of an appellant. We have deemed it not inappropriate to say this much in regard to this procedure in an attempt to perfect an appeal in a criminal case, that our disapproval of same may be emphasized.

In the absence of prejudicial error, the judgment of the trial court is affirmed, and it is so ordered. All concur.