## THE STATE v. CHARLES BLACKBURN, Appellant.

Division Two, February 16, 1918.

1. **EVIDENCE: Giving of Check: Pretense: Declaration of Deceased.** Where defendant has testified that a check given by him to deceased was a mere pretense, made to conceal an alleged land deal, the State has the right to show what was the intention of the deceased in respect to the matter, by showing his statements to others and his conduct in reference thereto.

2. ———: **Intent: Condition of Mind: Declarations of Deceased.** The present condition of deceased's state of mind as to intent and purpose may be shown by his language and conduct evidencing such purpose, in a murder trial, and where such intent is relevant such declarations are direct evidence, and not hearsay; but by instructions may properly be limited to a showing of such intent.

3. ———: **External Matters: Declarations.** But the declarations made by deceased prior to the homicide concerning external matters and not pertinent to show his state of mind, are hearsay and incompetent.

4. ———: **Admissions of Defendant: Statements at Coroner's Inquest.** Statements at the coroner's inquest by defendant, who had been summoned by the State, was sworn as a witness for the State, was suspected of the murder at the time by the representative of the State, was not represented by counsel, was not informed of his right to refuse to answer questions and was subjected to a long adverse examination, are incompetent evidence, and their admission is in violation of his constitutional protection against self-incrimination.

5. ———: **Value of Farm.** Evidence as to the value of the farm which defendant claims to' have sold to deceased is competent in the murder trial, for the purpose of showing no such contract of sale was ever made, on the theory that a good business man would not probably contract to pay $11,500 for a farm worth not more than $7,500.

6. ———: **Failure to Join in Search For Deceased.** Evidence that defendant failed to join in the search for deceased whose dead body, covered with leaves, shot in the head, the skull broken by some other instrument, was found close to the road leading from defendant's farm to the near-by town where his family resided, twelve days after he had disappeared, only a day or two' after he had sold his cattle to defendant and according to defendant's story had bought his farm, is a competent circumstance to be shown in evidence; but its weight is for the jury.

Appeal from Camden Circuit Court.—*Hon. C. H. Skinker*, Judge.

REVERSED AND REMANDED.

*Frank H. Farris, Phil Donnelly, I. W. Mayfield* and *W. P. Mayfield* for appellant.

(1) The admission of the testimony of witnesses Winfrey, Fry, Smith, Evans and others, as to the state-

ments of deceased made on the afternoon of November 9, 1915, and on other days prior to the morning of November 10th, at which time the deceased is supposed to have met his death, and at places from one to five miles distant from the scene of the killing, were wholly incompetent and prejudicial to the defendant, for such statements were not a part of the *res gestae,* were not dying declarations, were not made in the presence of the accused, and all of them were hearsay. State v. Wilson, 250 Mo. 329; State v. Kelleher, 224 Mo. 167; State v. Church, 199 Mo. 634; State v. Brown, 181 Mo. 216; State v. Terry, 172 Mo. 219; State v. Hendricks, 172 Mo. 673; State v. Locket, 168 Mo. 487; State v. Hudspeth, 159 Mo. 204; State v. Duestrow, 137 Mo. 321; State v. Thompson, 132 Mo. 321; State v. Punshon, 124 Mo. 457; State v. Nocton, 121 Mo. 552; State v. Raven, 115 Mo. 442; State v. Rider, 95 Mo. 486; Carroll v. Frank, 28 Mo. App. 70; State v. Walker, 78 Mo. 388; State v. Umfried, 76 Mo. 407; State v. Thomas, 68 Mo. 612; State v. Evans, 65 Mo. 578; State v. Brown, 64 Mo. 371; 12 Cyc. 429; Rex v. Thompson, Anno. Cases 1913 A, 530. (2) The admission of testimony as to alleged statements made by the defendant at the Coroner's inquest was error; he was summoned as a witness and sworn, put under the duress of an oath, was not represented by counsel, was suspected of the crime and not advised thereof, nor of his right to refuse to testify, was examined, cross-examined, browbeaten, threatened, treated with contempt and disrespect, surrounded by a mob, and statements made under such conditions are inadmissible against him. 21 Cyc. 994; State v. Thomas, 250 Mo. 211; State v. Thornton, 245 Mo. 440; State v. Marion, 235 Mo. 375; State v. Young, 119 Mo. 517; Ex parte Gauss, 233 Mo. 282. (3) The admission of testimony in rebuttal, or, for that matter, on direct examination, of the value of defendant's farm, was inadmissible for any purpose; the price, if any, to be paid by deceased was a matter of contract between him and the defendant, and deceased's idea of the value of the land and, in fact,

the value of the land to the deceased, may have been far in excess of the value fixed by others or of what they honestly believed its value to be; and their opinion as to its value was an attempt to make their value the opinion of the deceased, and to create the impression that because deceased was paying a greater sum of money for the land than some of his neighbors thought it worth was evidence defendant killed him. Inadequacy of consideration is no ground for refusing the enforcement of a civil contract, either in law or equity, and standing alone is not evidence of fraud or undue influence. 9 Cyc. 367, 463; Brownlow v. Wollard, 66 Mo. App. 641; Chenowith v. Express Co., 93 Mo. App. 193; Scriba v. Neely, 130 Mo. App. 261. (4) The admission of testimony that the defendant did not hunt or assist in the search for deceased was also error. The defendant is not called upon to speak, nor the law does not require him to act until a charge is made to him and against him. State v. Gordon, 199 Mo. 592. (5) All of the testimony on part of the State, standing alone, is not sufficient to overcome the presumption of innocence and to establish defendant's guilt beyond a reasonable doubt, and the testimony as a whole is as consistent with the theory of innocence and more so than it is with any theory of defendant's guilt. It simply establishes. two facts, that deceased was killed, when and by whom is a matter of conjecture, and that defendant and deceased had been and were shortly before the killing negotiating a lawful business transaction, and the State assumed and the jury took as true, that these two facts were sufficient upon which to convict the defendant and take from him his liberty for life. The verdict is not supported, the judgment is not just, and the cause should be reversed. State v. Gordon, 199 Mo. 593.

*Frank W. McAllister,* Attorney-General, and *Henry B. Hunt,* Assistant Attorney-General, for the State; *Sid C. Roach* and *L. C. Mayfield* of counsel.

(1) The appellant having filed no brief in this case, we will follow the assignments of error, as set up in

appellant's motion for a new trial and in arrest of judgment. The court did not err in overruling appellant's instruction in the nature of a demurrer to the evidence, offered at the close of the State's case. State v. Swain, 239 Mo. 728; State v. Wertz, 191 Mo. 578; State v. Stewart, 116 Mo. App. 330; State v. Warner, 74 Mo. 85; State v. Pollard, 174 Mo. 614. (2) The seventh assignment, that the verdict is not supported by any substantial evidence, is refuted by the record. State v. Scott, 214 Mo. 261; State v. Howell, 100 Mo. 659; State v. Maurer, 255 Mo. 168. (3) The statements of deceased to witnesses Winfry, Fry, Smith, Evans and others were properly admitted in evidence. State v. Thompson, 132 Mo. 322; State v. Thompson, 141 Mo. 416.; State v. Kennedy, 207 Mo. 539; State v. Kennade, 121 Mo. 413; Gomaz v. State, 170 S. W. (Tex.) 713; Pound v. Georgia, 43 Ga. 129; State v. Pearce, 87 Kan. 463; Martin v. State, 77 Ala. 10; Spivey v. State, 169 S. W. (Ark.) 951; Hunter v. State, 40 N. J. L. 436; Merritt v. State, 45 S. W. (Tex.) 21; Keener v. State, 18 Ga. 224; State v. Vincent, 24 Ia. 573. (a) The general rule of *res gestae.* State v. Thompson, 132 Mo. 322; State v. Day, 100 Mo. 248. In the very nature of things the *res gestae* must vary as the fact of each case vary. State v. Thompson, 132 Mo. 322; Fowler v. Railway, 182 Ill. App. 132; Pound v. Georgia, 43 Ga. 130; Price v. State, 98 Pac. (Okla.) 452. (b) The subsidiary act need not transpire at the same instance with the main one, or always even on the same day; and, in reason, as well as in accordance with the current of the authorities, the time which divides the two is not the controlling consideration, though it may be taken into the account. Is it presumable that, distinctly and palpably, it influenced or was influenced by the main act, or proceeded from the same motive? If so, it is admissible, otherwise not. 2 Bishop's New Crim. Proc., sec. 1085; 1 Greenleaf on Evidence (16 Ed.), sec. 108; State v. Day, 100 Mo. 248; Davids v. People, 192 Ill. 189; Price v. State, 98 Pac. 447; State v. Kennade, 121 Mo. 413; 6 Ency. Ev. 614.

(c) Any evidence that tends to show motive for killing the deceased is always relevant as rendering more probable the inference that he did kill him. Underhill, Crim. Ev. (2nd Ed.), sec. 323; State v. Miller, 156 Mo. 86; State v. Hyde, 234 Mo. 226; Smithson v. State, 137 S. W. (Tenn.) 490; 1 Greenleaf's Ev. (Lewis Ed.), sec. 108. (4) Voluntary statements of the appellant, made when a witness at the coroner's inquest, are properly admitted in evidence. State v. Thomas, 250 Mo. 212; State v. Thornton, 245 Mo. 440; State v. Marion, 235 Mo. 375; State v. Young, 119 Mo. 516; State v. Wisdom, 119 Mo. 551; State v. Mullens, 101 Mo. 520; People v. Kelly, 47 Cal. 125. The contention that the verdict is insufficient to support the judgment is groundless. State v. Lawler, 220 Mo. 33; State v. Whitton, 68 Mo. 91; State v. Patterson, 116 Mo. 511; State v. Kattlemann, 35 Mo. 107; State v. Schmidt, 137 Mo. 270; State v. Van Wye, 136 Mo. 243.

ROY, C.—Defendant was charged by information with the murder in the first degree of Jasper Francis on November 10, 1915. He was convicted and his punishment fixed by the jury at life imprisonment. He has appealed.

The evidence for the State tends to show the following facts: Both the deceased and defendant were farmers and stockmen, with farms on the same road leading out of Stoutland, the defendant's being about two and a half miles from town, and that of Francis being about four miles further on. The deceased was a bachelor about forty-six years old, in comfortable circumstances financially, a director in the bank at Stoutland. The defendant was about forty-three years old. His farm contained two hundred and sixty acres and was worth about $7500. His wife owned a house and about five acres of land in town, where they lived. He spent much of his time on the farm, often passing the night there. His farm was encumbered for $4000 and some interest. The home in town was encumbered for $2000, and he owed the bank about $3000 in notes signed by himself and wife. The bank was pressing

him for a payment of at least a portion of that money
About October 30, 1915, defendant and deceased made
a trade by which deceased sold and delivered to de-
fendant cattle for $1400, and received in part payment
thereof a span of mules at $200. It seems that defend-
ant did not then pay the balance of $1200 due of the
cattle.   Rolla Smith, assistant cashier of the bank,
testified that in the latter part of the week preceding
the death of Francis, the latter appeared in the bank,
asked the amount of the defendant's indebtedness to
the bank, and was informed that it was about $3000;
whereupon Francis said: ''Charley has sold his farm
and has got the paper and you boys want to get your
money.  I know he has sold his farm because I wrote
up the note for him and check a few days ago.   The
note is for $3000, and the check for $1500.  He has
sold his farm to Joe Givins, and is receiving this note
and check for $1500, and he is assuming $3000 against
the land, making $7500.   Your note will be due the
first thing, and you boys want to get in and get your
money.''   On Sunday, November 7, the defendant ship-
ped the cattle to the St. Louis market, ordering the
returns to be sent to Lebanon instead of to the bank
at Stoutland.   On the next day Francis, not knowing
that the cattle had been shipped, presented to the bank
for payment a check drawn in his favor by the de-
fendant for $1200.  It was not paid for lack of funds
to the defendant's credit.  It was left with the bank
for collection.  On the next day, Tuesday, November
9th, Francis met Evans, the cashier of the bank, at a
sale in the country, and was informed by the latter
that the defendant had shipped the cattle.   That
evening, about sundown, Francis was in Stoutland.
Evans was a witness for the defendant.   On cross-
examination he was asked what Francis said and did
at that time with reference to the collection of that
check.   Defendant's counsel objected on the ground
that it called for hearsay evidence which was not a
part of the *res gestae,* and not a dying declaration.
The objection was overruled, and the witness stated that

he and the deceased talked about why the returns for the cattle were not there, and that deceased stated that he would wire the commission company to find if the cattle had been sold and where the returns had been sent, and that deceased went to the station to see the agent saying, after seeing the agent, that he would go by Blackburn's and tell him that something had to be done. Over similar objections by defendant, the State was allowed to prove by Reube Winfry that deceased spoke of the $1200 check and said that he thought that Blackburn was trying to cheat him out of the cattle; and was allowed to prove by Rolla Smith, assistant cashier of the bank, that deceased in the bank, on November 9th, said that if the returns did not come by morning he would garnish everything that Blackburn had. And was allowed to prove by John Fry, station agent at Stoutland, a conversation with Francis as follows:

"Q. What is it? A. He asked me if Charley Blackburn had shipped the car of cattle; I told him he had; that he had shipped them on the Sunday previous. Then he asked me who he had shipped them to; I told him to Clay-Robinson & Co. He then wanted to wire to Clay-Robinson & Co. in regard to the returns. The hour was late and I recommended him, on account of the lateness of the hour, to wait or put it off until morning, when probably the returns would get in; that it would not be necessary to wire, and even if he did, it would be about the same time in the morning before the message would be delivered if it was sent at that late hour of the day. He said then he believed he would do that, and that he would go over and see Virgil Evans at the bank.

"Q. Did he state anything else; is that all of his statement to you at that time? A. No sir; that was not all that was said.

"Q. Did he state why he was anxious to wire to Clay-Robinson & Co? A. He told me he had exchanged the cattle with *Charley Blackburn for $1200 and two mules; that he held Blackburn's check for $1200,*

*and the funds were not yet in the bank to pay the check; that Blackburn had said to him he would arrange for the money and that it would be in there in a few days. He said as long as the cattle were running upon Blackburn's land he did not care, but since he has shipped them, 'I am going to do something about it.' "*

And by Charles Winfry a conversation with Francis as follows:

"Q. "Yes sir. *A. When we started from the sale he says, 'Charley Blackburn has shipped those cattle and I did not know anything about it until I got down here to the sale.' He said, 'Virgil Evans told me.' He said, 'He was at my house this morning and he never told me a word about it. He said he was going to Joe Givins's to see about the money that Joe had sent and sent to the wrong place; it is a funny thing to me that he don't know where Stoutland is at.'* He says, 'I am going on to town and see if that draft has come; if not, I am going back by Charley Blackburn's and tell him what is what; I am not going to lose my money on those cattle.' He says, 'I will garnishee everything he has got before tomorrow night if I don't get the money; all I have got to show is the two little mules and this check' that he had up at the bank. *He said Charley Blackburn was talking of buying his place, but he could not pay for what he already had."*

We have put in italics portions of that evidence to which we will call special attention in the opinion.

The last seen of Francis alive was as he was on his way home just as he was leaving town that evening. About twelve days later his dead body was found about twenty yards from the road between the defendant's house and town, covered with leaves. There was a shot in the head, and the skull was fractured by some other weapon. There was clotted blood by the roadside. Mrs. Kissinger, who lived near the place, testified to hearing a gun shot about the place where

the death occurred, on the morning of November 10th, about five o'clock.

Claude Castile and his wife testified that they lived next door to the defendant in town, and that on the morning of November 10th, about six o'clock, they saw defendant in his yard in town, and that, in reply to a question, he told them that he had come in town that morning.

On November 11th, the defendant appeared at the bank, having in his possession a note for $3000 dated October 30, 1915, due sixty days after date, a check for $1500 dated November 2, 1915, and a check for $1200, dated November 6, 1915. All those instruments were payable to himself and purported to be signed by Francis. He exchanged with the bank the $1200 check signed by Francis for the $1200 check signed by himself, which was then held by the bank for collection. He exchanged the note for $3000 signed by Francis for his own notes to the bank. The $1500 check signed by Francis was put to defendant's credit, thereby overdrawing the account of Francis, and a few days after he checked out the most of it.

Soon after the discovery of the dead body, the coroner's inquest was held. The examination of witnesses at that inquest was conducted by State's counsel, who suspected defendant of the offense. The defendant was subpoenaed and sworn as a witness and submitted to a long and adverse examination. Everything he said was in answer to such questions. He was without counsel, and was not advised of his right to refuse to answer questions, nor was he advised that his answers might be used against him. He was there treated as a defendant. At the trial the State was permitted to prove that the defendant, in answer to questions at such inquest, stated that he gave the check for $1200 to Francis for cattle, and also said that the two $1200 checks were given as a bonus in a land deal. Defendant objected to such evidence on the ground that such statements were not, under the facts shown, voluntary. The objection was overruled. The

defendant, on the trial, testified that about October 30, 1915, he sold his farm to Francis for $11,500 to be paid thus:

| | |
|---|---:|
| Balance on cattle ..................... $ | 1200.00 |
| Check . . . ............................. | 1500.00 |
| Note . . . .............................. | 3000.00 |
| Francis to assume on land ............. | 3000.00 |
| Francis to give mortgage for .......... | 2000.00 |

$10,700.00

and that Francis was to pay balance in money. He stated that a few days after such deal Francis wrote, signed and delivered to him the note for $3000 and the check for $1500; that Francis made a memorandum of the contract, but that it was not signed by either of them; that they were to close the deal and make the deed later on. During his direct examination, he was asked why the two $1200 checks were given. He answered that Francis desired to keep secret for a few days the fact that he had bought defendant's farm, for fear that if such fact should become known it might prevent the sale which Francis desired to make of his own farm. As to his conversation with Francis he testified:

"He said, 'Would you care to give me a check for the cattle?' that is, for the difference between the mules and the price of the cattle; he told me to give him that $1200 check and he would take it up to the bank and turn it over to the cashier, Virgil Evans, and he would tell Virgil about mine and his deal; he said he would put the check in there and if any one came in there and said anything to Virgil about Jap buying my farm and about the cattle and mules being changed he said Virgil could show them this check, which would show that he had sold the cattle to me. So when he was talking about my giving him a check I told him it would be all right I guessed; that I didn't know there would be anything wrong about it. He opened that book up this way (indicating) and began to write out a check for $1200 for me to sign. Just

about the time it was completed I says, 'Jap, how would it do for me to write out a check for you and you sign it and let me have your check and you hold mine?' So we agreed to that; we agreed to do it in that way. That is the way the $1200 check business came up.'' He stated that such transaction occurred November 6th.

Simpson Francis, a brother of the deceased, testified that on Sunday after the deceased disappeared, he called up the defendant asking him if he had seen the deceased, and that defendant answered: ''He was going to meet me in Lebanon, but he didn't go. I guess you don't know what we were going for. I will tell you, I was selling him my farm and I was going up there to pay the mortgage off to Wallace. We are going to Linn Creek Tuesday to finish up the deal.''

The defendant objected to evidence on the part of the State as to the value of defendant's farm, on the ground that it was purely a matter of contract between the parties. The objection was overruled. There was no attempt on the part of defendant to show that the farm was worth more than $7500. There was testimony both ways as to the genuineness of the signatures of Francis to said note and checks. Those instruments and about fourteen genuine checks of Francis are before us for comparison. We venture no opinion. The ''paid'' stamp of the bank is placed twice over the signature to the note, very much obscuring it. The cashier of the bank testified that it was the custom to thus stamp paid notes. In this case the note is also stamped by the bank ''paid'' on the back. The genuine checks before us are only stamped on the back.

The State was allowed to prove that defendant took no part in the search for the deceased after his disappearance over the objection of defendant that such evidence was immaterial.

Soon after the coroner's inquest the brother of the deceased began suit against the defendant to annul the alleged deal between the defendant and the deceased,

and to recover the money.  Thereupon there was a settlement between the estate and the defendant by which the amount of the checks for $1200 and $1500 was restored to the estate and the note for $3000 was surrendered to the estate.  Defendant kept the mules. Soon after such settlement this prosecution was begun.

I.  Appellant claims that the evidence of the witnesses Evans, the two Winfrys, Fry and Smith as to statements made by Francis in regard to the defendant and the collection of the $1200 check is hearsay, and, for that reason, incompetent.  We think that objection well founded as to those portions of that evidence which we have put in italics in the statement.  But as to the remainder of that evidence the claim of the defendant is rather a bold one, under the circumstances of this case.  Ordinarily a check shows the intention of both -parties thereto that it shall be paid.  The defendant claims that in this case such ordinary intent did not exist, that the check was, in the contemplation of both, a mere pretense—a harmless one it is true—but only a pretense, made to conceal the alleged land trade.  Defendant's own testimony is to that effect.  When the State is met by such a claim backed up by evidence, it certainly has the right to show what the intention of Francis was in that respect, by showing his language and conduct in reference thereto.  In Waterman v. Whitney, 11 N. Y. 157, SELDEN, J., said:

*Deceased's Declarations.*

"The difference is certainly very obvious between receiving the declarations of a testator, to prove a distinct external fact, such as duress or fraud for instance, and as evidence merely of the mental condition of the testator.  In the former case, it is mere hearsay, and liable to all the objections to which the mere declarations of third persons are subject; while in the latter it is the most direct and appropriate species of evidence."

We have not overlooked the fact that in that case the subject of inquiry was the testator's mental condi-

tion as to sanity; but the authorities practically agree that the condition of the one's mind as to intent or purpose may be shown in the same way, by the language and conduct of such person evidencing such purpose or intent. As to the external facts recited in the language of the declarant that language is hearsay; but as to the declarant's purpose or intent it is direct evidence. 3 Wigmore on Evidence, sec. 1725, says:

"But, as a condition of mind, the plan or design may also, it is clear, be evidenced under the present exception by the person's own statements as to its existence. The only limitations as to the use of such statements (assuming the fact of the design to be relevant) are those suggested by the general principle of this exception *ante,* sec. 1714), namely, the statements must be of a *present existing state of mind,* and must appear to have been made in a natural manner and not under circumstances of suspicion."

That the intent of a person (where such intent is relevant) may be shown by his acts and words, and that such acts and words are direct, and not hearsay evidence as to such intent, is clearly laid down in State v. Ilgenfritz and Davis, 263 Mo. 615. We think that under the ruling in that case, the acts and statements of Francis, except as above ruled, are direct and competent evidence in the case for such purpose. We suggest that on a retrial of the cause it would be proper to instruct the jury that the force of such evidence should be limited to the showing of such intent. [Sotebier v. Transit Co., 203 Mo. 702; Stanard Milling Co. v. Transit Co., 122 Mo. 258.]

II.   The admission of the evidence as to alleged statements made by defendant at the coroner's inquest was clearly an error. He was summoned **Statements** by the State as a witness at such inquest, **At Coroner's** and was sworn as such witness. He was sus-**Inquest.** pected of the crime at that time by the representative of the State. He was not represented by counsel, nor was he informed of his right to refuse to answer questions. He was subjected to a long, adverse

examination. The constitutional protection of the defendant against compulsory self-crimination was thereby denied. It was so held in State v. Young, 119 Mo. l. c. 520; State v. Naughton, 221 Mo. 398; State v. Lehman, 175 Mo. 619.

III. Defendant contends that the admission of evidence as to the value of his farm was error. It is contended that the question of such value is one solely of contract between the parties thereto and that it is of no concern to any one else. That may be conceded, perhaps, where the existence of the contract is not in controversy. The making of such contract is not conceded by the State, and such evidence is competent for the purpose of showing that no such contract was ever made, on the theory that a good business man would not probably contract to pay $11,500 for a farm not worth over $7500.

<div style="margin">Value of Farm.</div>

IV. Defendant likewise contends that it was error to permit the State to show that the defendant took no part in the search for the deceased. We are cited to State v. Gordon, 199 Mo. l. c. 592, where it was said:

"Again, our attention is directed to the circumstance that the defendant upon seeing his wife lying motionless and dead did not call to her, nor did he touch her or the gun. We dare say that if conditions similar to those confronting the defendant upon the morning his wife was killed should surround a hundred men, no two of them would act alike. There is no accounting for the conduct or actions of a man under the circumstances surrounding the defendant at the time he went into the kitchen and found his wife dead, and his conduct and actions at that time, under conditions confronting him, in our opinion, are of little significance. No man can tell what would be the actions of a person similarly situated; therefore, we are unwilling to attach to the conduct and actions of the defendant at that time the importance that learned counsel for respondent so earnestly insist upon."

The context shows that the court was there discussing the sufficiency of the evidence to sustain a conviction. The admissibility of such evidence was not discussed. It was there said that is was "of little significance." We hold that the failure of the defendant in this case to join in the search for the deceased was a competent circumstance to be shown in evidence. Its weight was for the jury.

V. Defendant contends that there is no sufficient evidence to support a conviction. We are sorry to say that we are of a contrary opinion.

The judgment is reversed and the cause is remanded for a new trial.

*White, C.,* concurs.

PER CURIAM:—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All of the judges concur.