STATE v. EMIL CARL HUTSEL.—No. 40686.—208 S. W. (2d) 227.

Division One, February 9, 1948.

J. E. Taylor, Attorney General, and Samuel M. Watson, Assistant Attorney General, for respondent.

[228] VAN OSDOL, C.—Appellant was charged by information with the murder of his wife, Margaret White Hutsel. Upon trial he was convicted of murder in the first degree and his punishment assessed by the jury at imprisonment in the penitentiary for life.

Appellant has filed no brief herein, and his motion for a new trial contains thirty-two assignments of error. Many of the assignments are so general as to fail to comply with the statute relating to motions for a new trial. Section 4125 R. S. 1939, Mo. R. S. A. sec. 4125. The general assignments, not setting forth in detail and with particularity the specific grounds relied on for a new trial, are not examined herein. Other and particularized assignments of error are examined in the course of the opinion. The sufficiency of the

evidence to support the conviction is the principal question raised by appellant's motion.

We believe there could be no doubt of the sufficiency of the evidence to support the conclusion that appellant's wife met her death as a result of a criminal agency, but the sufficiency of the evidence in implicating appellant as the murderer is doubtful, except for a confession and the testimony of appellant at the coroner's inquest, which confession and a transcript of which testimony were admitted into evidence by the trial court. It is assigned by appellant that the confession and the transcript were incompetent because induced by promises of immunity, and extorted by threats to implicate and imprison appellant's young daughter, Emily. Thus it is seen the principal question raised by appellant's motion should be resolved in his favor if the confession and transcript were erroneously admitted into evidence.

November 15, 1946, appellant, thirty-seven years old, and his wife, thirty-four years old, lived in a small frame house (three rooms) at 7222 Devonshire Avenue in St. Louis County. They had two children—Emily, in her fourteenth year, and Carl, eleven years old. The wife had been in ill health. She had suffered one or more "paralytic strokes, for two years she had been ailing, off and on." She had been under a doctor's care for the last five years and, after a paralytic stroke, was in St. John's Hospital for about five weeks. Just prior to the homicide, she was much better and was elated with the improvement in her physical condition.

Appellant was employed as a mechanic, an automobile "body worker," in the St. Louis Dairy Company's garage situate at 22d and Eugenia Streets in St. Louis. He worked the "day shift," 8:00 A. M. to 5:00 P. M.; but, on November 15th, worked overtime. It was his testimony that, having worked until about "ten minutes to twelve (P. M.)" he departed for home, stopped briefly on the way, and upon entering his home through the kitchen door "as I turned on this light, you could see in the bedroom . . . I saw my wife laying in a clot of blood." Appellant wakened his children and, discovering the telephone was disconnected, took the children with him to a filling station on Chippewa Avenue; he there attempted to call a doctor by telephone, and then called the police.

Testimony of witnesses for the State was introduced tending to show that early (about one o'clock) in the morning of November 16th appellant called the police of the City of St. Louis by telephone from a filling station on Chippewa Avenue and Watson Road and stated 'that a burglary had been committed at his home and his wife had been slugged. The St. Louis police referred the report to the police of the village of Shrewsbury; and Joseph Lemberger, chief of police of the village, was the first officer to reach appellant's home. The appellant was there present when the officer arrived. Appellant's

wife was lying in bed. It was determined that she was dead. She had been shot in the left temple with a pistol held three or four inches [229] from her head. Later, having moved the body, the officer found a small slug "very mashed up." The telephone had been disconnected and was lying on the floor; otherwise the room was not in disorder. A pocketbook on the dresser containing three $10 bills and three $1 bills had not been disturbed. Having made the preliminary investigation, the officer took appellant to the City Hall and questioned him. Appellant made statements of his whereabouts throughout the preceding day. He then took his children to the home of his brother-in-law in Montgomery City; and upon his return, at about eleven o'clock the morning of November 16th, appellant was questioned by officers of St. Louis County, particularly by deputy sheriff Harry Newbold. In the course of this examination, according to the testimony of the officers, appellant confessed his complicity in the murder of his wife. Appellant testified he made no statement. He said the confession "was formed there for me to sign." The purported confession was typed by the officer Newbold in question and answer form; each page was authenticated by appellant's initials and the confession was signed by him, November 17th. Later, November 19th, appellant testified at the coroner's inquest to facts in substance the same as were the facts stated in the confession. The appellant testified he was told by the officers to give the same statements at the inquest "if I knew what was good for me." A transcript of his testimony at the inquest was later examined by appellant, corrected, each page initialed and the transcript signed by him, November 27, 1946.

Facts stated in the confession are summarized as follows,

On November 15th appellant was living with his family at the residence on Devonshire Avenue in St. Louis County. His wife was fatally shot the night of November 15, 1946, at about 11:10 o'clock. A few days prior to Sunday, October 27th, appellant had met a Negro, Thad (or Seth) Crawford, whom he had known about fourteen months. Appellant had become acquainted with Crawford through a negress, Alma Mackey. Appellant talked to Crawford about disposing of appellant's wife and asked Crawford if "he would dispose of her, he told me he would think about it, and if he did not, he would get someone." Appellant met Crawford and Alma Mackey at Crawford's home on Sunday night, October 27th; another Negro, Sunny Harrison, whom appellant had not known, was present. Appellant, Crawford and Harrison discussed killing appellant's wife—"Crawford said this other man (Harrison) would take care of it . . . I told them I did not want a knife used or any instrument, but to use a gun, and to make it short and quick, I did not want her to suffer, but to get it over with as fast as possible . . . Crawford said he had the gun." It was agreed that appellant should pay $100, and on Friday, November 1st, appellant gave Crawford that sum—it had been

planned that appellant would take his children away from home that evening and appellant's wife, being left alone, was to be murdered by Harrison. Appellant did take his children from home early in the evening, and, upon returning home at 9:30 P. M., found his wife unharmed. "I felt like I got stuck for the One hundred dollars . . . I called Crawford on the phone the next day, he said they went out there and he thought it had been done, I told him it had not been done, he said he did not know what happened, but that he would try and rearrange it then." On November 7th or 8th, appellant met Crawford and Alma Mackey on the street and it was agreed among them that Crawford would kill appellant's wife on Friday, November 15th, for "an additional Fifty dollars plus what he had already received . . . and also whatever money was found in her billfold." It was arranged that appellant would "slip away" from his work long enough to ride out with Crawford and Alma Mackey to see that they "disposed of my wife." Appellant left with Crawford in Crawford's automobile. They were accompanied by Alma Mackey, and two small children who were asleep. They stopped at appellant's home. Appellant got out and stayed behind the car while Crawford went into the house and fired the fatal shot, "as he was coming from the house, I went up, and went in the house to [230] make sure, and I saw she had been shot, Crawford had a flashlight, and I took the light, I shown the light on my wife and could see she appeared to be dead, I went back to the car . . ."

There was also evidence that, using his automobile in going to his work, appellant had become acquainted with a young woman, Virginia Atchison, whom he transported with others to their employment "during . . . gas rationing." Appellant and Virginia became friends. They went out together about once a week to places of amusement. He told her he would like to marry her in the event of his wife's death, "if he married anybody, he would rather marry me." He told her "his wife had had two strokes, and she was expected to have the third, which would be the end"—this conversation was in late September or early October, 1946.

Upon the issue of the voluntariness and consequent competency of appellant's confession, the trial court conducted a preliminary hearing out of the presence of the jury, and heard testimony of the circumstances in which appellant confessed; evidence of the circumstances of appellant's testimony at the inquest was also heard in the preliminary inquiry. At the conclusion of the preliminary hearing the trial court admitted the confession into evidence; and the transcript of the appellant's testimony at the inquest, although not authenticated by the transcribing reporter, was admitted into evidence as a statement signed by appellant and sworn to by him. Thereafter, testimony of the circumstances in which appellant confessed and of the circumstances of his appearance at the inquest was admitted into evi-

dence. Appellant testified the officer Newbold promised "he would set me a free man, and he was accusing my daughter in this . . . ." He testified he was "led to sign this statement . . . by threatening and accusing my daughter and bringing in this Virginia Atchison, when they had nothing whatever to do with this . . . I signed that paper, because I was promised freedom." The officers testified no person had made any promises to appellant, and no person had threatened him or his daughter in any way. (Statements of the police, which lead a defendant to believe that unless he confesses a third person will be incarcerated, are not, it seems, sufficient to invalidate the confession, although the doctrine has been questioned. State v. Williamson, 339 Mo. 1038, 99 S. W. 2d 76; State v. Gibilterra, 342 Mo. 577, 116 S. W. 2d 88; State v. Faber, Mo. Sup., 182 S. W. 2d 552.)

The rule in this state is that "if the defendant object to the admission of the confession on the ground that it was involuntary, and request a preliminary inquiry out of the presence of the jury, the same should be granted." State v. Gibilterra, supra, 342 Mo. at page 584, 116 S. W. 2d at page 93. In the Gibilterra case this court further discusses the trial court's duties relating to instructions on the issue of "voluntariness" when the issue is submitted to the jury. See also State v. Pillow, Mo. Sup., 169 S. W. 2d 414 at page 416. It would not be useful to repeat the discussion here. In the instant case, upon appellant's objection based on the ground his statements were involuntary, the trial court made preliminary inquiry without the presence of the jury, although the appellant had not so requested. As we have seen supra, there was substantial conflicting evidence on the issue; the trial court admitted the confession into evidence; and the trial court by instructions submitted the underlying issue of the "voluntariness" of appellant's statements, "oral and written," to the jury. The issue was thus determined in the State's favor by both the rulings of the trial court, and by the verdict of the jury. No error being manifest, we defer to the trial court's rulings, the trial court having had the better opportunity to arrive at the truth.

At the inquest appellant testified in answer to questions propounded by the coroner. According to the transcript, preliminary to his inquiry, the coroner advised and interrogated appellant as follows, ". . . it is your privilege to testify at this inquest or refuse to testify. You may stand upon your constitutional rights as an American citizen and refuse to testify for fear that anything you may now say may incriminate you, or be used [231] against you. What is your pleasure, to testify or refuse to testify? A. I will testify. Q. You have had time to think this over—you still want to testify? A. Yes, sir."

The constitutional provision that "no person shall be compelled to testify against himself in a criminal cause" (Section 19, Article I,

Constitution of Missouri, 1945) is a privilege that may be waived. If a defendant's testimony be *voluntarily* given in a preliminary or collateral proceeding, it will thereafter be competent as evidence against him. State v. McDaniel, 336 Mo. 656, 80 S. W. 2d 185 (defendant's testimony at coroner's inquest held voluntary and admissible at defendant's trial); State v. Cook, Mo. Sup., 44 S. W. 2d 90 (defendant's testimony at coroner's inquest held voluntary and admissible at the trial); State v. Blackburn, 273 Mo. 469, 201 S. W. 96 (defendant's statements at inquest held involuntary, and erroneously admitted into evidence); State v. Young, 119 Mo. 495, 24 S. W. 1038 (defendant's statements at inquest held involuntary, and erroneously admitted). "The great question after all is, was the statement voluntary; and it must be determined from the facts in each case." State v. McDaniel, supra. The inquiry is not confined to questions whether the defendant was supoenaed to appear or was in the custody of an officer, and sworn to testify. The "test as to the admissibility of this character of testimony is no longer whether it was made in a judicial proceeding under oath, but, was it voluntary? If so, then it is admissible, otherwise not." State v. Miller, 264 Mo. 441, 175 S. W. 191; State v. McDaniel, supra.

In the case at bar, appellant, when in attendance at the inquest, was in the custody of an officer; he was not represented by counsel at the time; however, the evidence shows appellant, when he testified, was not ignorant of his constitutional protection against compulsory self-incrimination. He was informed of his rights and nevertheless testified. This fact is shown by the transcript of his testimony at the inquest, and by the testimony of the coroner and another witness at the trial. This is one fact of import differentiating the instant case from the cases of State v. Blackburn, supra, and State v. Young, supra. Moreover, although appellant is not an educated man, his testimony at the inquest and at the trial demonstrated his mental alertness. Being an alert adult, thirty-seven years old, appellant was not like the ignorant German boy in the case of State v. Young, supra. We hold the trial court did not err in admitting into evidence the transcript of appellant's testimony at the coroner's inquest. State v. McDaniel, supra.

Prior to the qualification of the jurors to try the cause, appellant had moved to quash the panel of veniremen on the ground "they are of mixed sex and that by reason of the nature of the evidence and the charge against defendant, being the alleged murder of his wife for another alleged woman, he cannot obtain a fair trial at the hands of the female sex who by virtue of their sex in such matters possess a code peculiar to them and therefore are not qualified to sit as fair and impartial jurors." It appears that one juror of the panel was a woman. The trial court overruled the motion. In this, appellant assigns error. Appellant made no averment in the motion to

quash, introduced no evidence, and made no showing that the original panel of veniremen had not been honestly and regularly selected according to law. Although a woman upon request should be excused, no citizen is disqualified from jury service because of sex. Section 22, Article I, Constitution of Missouri, 1945. And we are unwilling to impute to women the possession of any ''code peculiar to them'' which would render them the less qualified than men to sit as jurors in the trial of any cause.

■ Appellant contends the jury should have been instructed on circumstantial evidence. It is only when conviction is sought on circumstantial evidence alone that an instruction on circumstantial evidence is necessary. State v. Gadwood, 342 Mo. 466, 116 S. W. 2d 42; State v. Sandoe, 316 Mo. 55, 289 S. W. 890; State v. Donnelly, 130 Mo. 642, 32 S. W. 1124; State [232] v. Robinson, 117 Mo. 649, 23 S. W. 1066. In the instant case the State did not wholly rely on circumstantial evidence and such an instruction was unnecessary. Although there were facts circumstantially corroborative of appellant's statements in confession of his guilt, the statements of appellant, being correctly ruled admissible, were direct evidence of his guilt. State v. Hubbard, 351 Mo. 143, 171 S. W. 2d 701; State v. Robinson, supra.

■ The trial court did not err in advising the jury, in effect, that when two persons agree together to act in the commission of a crime, and pursuant to the agreement the crime is consummated by the act of one, the act of the one is the act of both. Appellant contends there was no evidence adduced that he had conspired with others to murder his wife. We believe the evidence reviewed supra, including specially appellant's statements, is sufficient to authorize the giving of the instruction.

■ An instruction was given relating to the presumption of appellant's innocence and the burden resting on the State to prove his guilt beyond a reasonable doubt. The instruction concluded with the paragraph,

''If, upon consideration of all the evidence, you have a reasonable doubt of the defendant's guilt, you should acquit; but a doubt to authorize an acquittal on that ground ought to be a substantial doubt touching the defendant's guilt, and not a mere possibility of his innocence.''

Appellant assigns error in the inclusion of the quoted paragraph in the instruction given, stating ten reasons supporting the assignment, which stated reasons may be summarized as follows—the paragraph modifies the ''law of the presumption of innocence''; prescribes degrees of reasonable doubt; and shifts the burden of proof from the State to defendant. The quoted language of the instruction is substantially the same, in the respects complained of here, as that of the instruction particularly considered and approved by this court so early as 1857 in the case of State v. Nueslein, 25 Mo. 111. (We be-

lieve the Nueslein case has not been overruled in this respect.) By the use of the word "substantial" and by the negativing of a "mere possibility," the instruction does "not require any thing more than a reasonable doubt" of appellant's guilt. The instruction given in the Nueslein case was commended in State v. Temple, 194 Mo. 237, 92 S. W. 869, and the language has long been approved as a correct declaration of the law. State v. Arnett, 338 Mo. 907, 92 S. W. 2d 897; State v. Smith, 332 Mo. 44, 56 S. W. 2d 39. See also State v. Peters, Mo. Sup., 123 S. W. 2d 34.

The trial court fully instructed on the subjects of presumption of innocence and reasonable doubt. Consequently, no error was committed in the refusal of instructions tendered by appellant on these subjects. State v. Peterson, Mo. Sup., 130 S. W. 2d 505.

As stated supra, the trial court submitted to the jury the underlying issue of "voluntariness" of appellant's statements confessing his guilt. Appellant proffered an instruction on this issue. The proffered instruction was erroneous (and in conflict with instructions given) in that the proffered instruction advised that the statements "to be used as evidence, must be wholly and entirely voluntary, *spontaneously* uttered of his own free will . . ." (Our italics.) As pointed out in the case of State v. Gibilterra, supra, quoting from State v. Hopkirk, 84 Mo. 278, "It is by no means necessary that the confession be spontaneous . . ." On the issue of voluntariness the ultimate question is whether an accused acts on his own judgment and volition uninfluenced by methods and devices employed by the officers which the law denounces. State v. Gibilterra, supra; State v. Williamson, supra.

Additionally to the examination of the errors particularly assigned in appellant's motion for a new trial, we have examined the record proper and find no error therein.

The judgment should be affirmed.

It is so ordered. *Bradley* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.