THE PEOPLE v. JEREMIAH CHAPMAN, IMPLEADED WITH OSCAR CHAPMAN AND JAMES REAGAN.

*Criminal law—Agreement by husband with another to furnish evidence to secure a divorce from his wife—By being detected in the act of sexual intercourse with her—If husband remains in close proximity—And sees the other party commit a rape on his wife— Without interfering to prevent the outrage—He is guilty as a principal under How. Stat. sec. 9545 —Preliminary examination—Failure to secure signature of a witness to his deposition until after magistrate has made his return to the circuit court—Such testimony being essential to warrant respondent's being held for trial—Is fatal to a conviction under an information based on such preliminary examination, respondent having moved to quash for the reason stated—Magistrate has no power to secure such signature after making such return—His jurisdiction over the case having ended.*

1. Respondent, desiring to obtain a divorce from his wife, agreed with one Reagan to furnish the necessary proof by being caught in bed or in the act of sexual intercourse *with* the wife, for which he was to receive twenty-five dollars. In pursuance of this arrangement, respondent and his brother concealed themselves in a room adjoining the one where the wife was, and Reagan, not succeeding in inducing her to *consent* to the proposed intercourse, accomplished his purpose by *force* and against her will, the husband witnessing the struggles of his wife, but not interfering to prevent the outrage; and he thereafter filed a bill for divorce for the alleged adultery with Reagan.

   *Held*, that he was properly convicted of rape, under How. Stat. § 9545, as a principal.

2. Respondent was informed against for a felony, and stood mute, refusing to plead to the information. During the trial he moved to quash the information for want of a preliminary examination, basing such motion upon the undisputed facts that depositions of witnesses taken

by the examining magistrate were not signed by nor read to them until after the justice had made his return to the circuit court; that on discovering the omission such signatures were obtained, but without reading the depositions to the witnesses, or administering any oath to them. Among those thus signing was a witness without whose testimony respondent could not have been held for trial.

*Held,* that the objection was well taken, and that the motion should have been granted.

:8. After an examining magistrate has made his return of the proceedings had before him in a case of felony to the circuit court, his jurisdiction over the case is ended, and he has no more right to amend such return by obtaining the signatures of witnesses to their depositions taken on such examination than a private person.

Error to Wayne. (Chambers, J.) Argued June 23, 1886. Decided July 1, 1886.

Information for rape. Respondent was convicted. Conviction reversed and respondent discharged. The facts are stated in the opinions.

*Allan H. Frazer*, for respondent.

*Moses Taggart*, Attorney General, for the People.

MORSE, J. Under our statutes, which render all persons aiding, assisting, or abetting in the commission of a crime, whether present or not present, liable to indictment, trial, and punishment as principals, the respondent was proceeded against, tried, and convicted of rape upon the person of his wife, Maggie Chapman. How. Stat. § 9545.

At the time of the trial the alleged actual perpetrator of the crime, James Reagan, had been convicted of the offense, and the testimony of defendant's guilt was mainly derived from his evidence, and that of the wife.

The principal objection goes to the merits of the case. It is claimed by defendant's counsel, in an elaborate argument, that the evidence does not warrant the conviction of the defendant.

The theory of the prosecution was that an agreement was made between the respondent and Reagan that, if the husband could catch Reagan in bed with Mrs. Chapman, or

in the act of sexual intercourse, by which the husband would be furnished with evidence to obtain a divorce from his wife on the ground of adultery, Reagan should be paid $25 by respondent; that, in pursuance of this plan, Jeremiah Chapman and Oscar Chapman, a brother of the accused, went into a room of the house where respondent lived, and bored a hole through the partition, where they could see into the part of the house where the wife was, or peeped through a partly-opened door; that Reagan went in and committed a rape upon Mrs. Chapman, who resisted the outrage, but not successfully; that the husband and his brother heard her screams and witnessed her struggles without offering to interpose in her aid; that Reagan knew they were there watching him; and that, after the crime was committed, or just at its completion, the respondent and Oscar burst into the room, the husband exclaiming, "Now I have caught you."

The defendant and his brother testified and maintained that no such bargain was entered into with Reagan; but, on the contrary, the husband being jealous and suspicious of his wife, they hid in the house for the purpose of verifying such mistrust; that Mrs. Chapman was a willing participant in adultery with Reagan; and that, while they were in the act, they rushed into the room, respondent grabbing a chair, saying, "I have caught you now right in the act; I have a notion to paralyze both of you."

The argument of the defendant's counsel is that the crime advised and bargained for with Reagan by respondent was not the crime committed, but adultery, and that the mere presence of the husband in the adjoining room, without any participation whatever in the offense, could not make him guilty of Reagan's independent crime; that his mental approbation was not sufficient, but his assent, to come within the statute, must have been manifest by some act of assistance in the perpetration of the rape.

We are cited to a number of authorities as sustaining these propositions. Not one of them is applicable to the

present case. If they were, they would not be authority for this Court.

If the story of Maggie Chapman be true, and it appears she has convinced twenty-four men of its truthfulness beyond a reasonable doubt, this husband is guilty of sufficient aid in the commission of the foulest of crimes to warrant his conviction as a principal under our laws.

She testifies that Reagan caught her by the throat, threw her down, and forced her to submit to his lust; that she tried her best to push him away and prevent him from accomplishing his design, and hallooed for help; that when her husband came in she said to him, " Oh, dear, kill him !" but respondent pushed her away from him, and soon thereafter he, his brother Oscar, and Reagan went away together, apparently on friendly terms.

It appears also that in three days after the commission of the rape or adultery, as the case may be, the respondent filed his bill for divorce upon the ground of the adultery of his wife with Reagan. He took no steps to prosecute Reagan, and a brother of Mrs. Chapman testified that soon after the alleged rape he had a conversation with the respondent in which the brother asked him, " Why didn't you shoot him?" Chapman replied, " I. didn't want to shoot him." The brother then asked him if he was a friend to Reagan, and he said he was.

The cases and text-books cited by defendant's counsel lay down the general doctrine, which is correct in principle, that the mere presence of a person when a murder or rape is being committed, without any previous agreement or conspiracy in furtherance of the crime, and doing nothing by word or act to encourage or sanction the perpetration of the same, will not hold him in the law in any degree guilty of the particular crime committed, although by his interference he might have prevented it. Such person may not be entirely guiltless in the eyes of the law, as the promptings of humanity, as well as his duty to society, demand that he shall use such means as he can to prevent injury and wrong to his fellows ; and, under the common law, if of full age, such

presence, without endeavor to hinder the commission of the felony or to apprehend the offender, was highly criminal, and punishable by fine and imprisonment. But it did not make him guilty, either as principal or accessory, of the crime thus committed in his presence. 2 Hawk. P. C. p. 442, § 10; 1 Hale, P. C. 439; Steph. Sum. Crim. Law, c. 3, p. 7.

But the case at bar is one in which aid and assistance were rendered. The husband was not a mere passive looker-on in the proceedings. Reagan knew he was in the next room, in sight of his work; and when the wife screamed, and respondent did not interfere, he knew that the husband was willing he should succeed in the accomplishment of the intercourse by force, if necessary,—an intercourse which had been bargained for by the husband. And the presence of the husband in the next room, waiting to catch the parties together, known to Reagan, both as to the presence and the purpose of such presence, imparted to him a confidence in his undertaking. And the husband intentionally gave reason for such confidence. By the lifting of his finger or the opening of his mouth he could have prevented the injury to his wife, but he did not do so. And he was ready to pay for the services of Reagan, and to profit by his crime.

Reagan swears that he told him that evening, after the transaction, as the three, respondent, Oscar, and himself, were going over to Miller's, "You are the boy; I will pay you for this;" and in a very few days respondent filed his complaint for divorce, alleging the adultery of his wife with Reagan for his cause. This conduct is corroborative of the claim that he hired Reagan to commit the crime of adultery, and that he was well satisfied with the rape instead, if it could be used to accomplish his main design, which was the putting away of his wife.

By his presence and his silence, under the fact of his previous agreement with Reagan, he must be considered as having countenanced and encouraged the latter in the commission of the outrage upon his wife. He did this as effectually as if he had stood in the room, and said to Reagan, "Go ahead; you shall have the money the same whether it be by

force or consent." If he had done this, there would have been no possible doubt of his guilt as a principal of the same crime as Reagan.

In this case the defendant and Reagan conspired to do an unlawful act; the one to commit a crime, and the other to pay him for it, to be present where he could witness its perpetration, and to use the crime to his advantage in getting rid of an undesired wife.

If Chapman had conspired with Reagan to rob a person, Reagan to commit the crime and Chapman to be present and share in the plunder, and in the act of robbery it became necessary, or Reagan supposed it did, to murder the person in order to accomplish the robbery, and Chapman had stood by, perfectly passive, but sharing in the spoils of the transaction, would he not have been guilty of the murder? Most assuredly he would. The malice and the assistance would be presumed.

I cannot see any distinction between such a case and the one before us, except that the moral guilt in the case at bar far exceeds in turpitude that of the supposed one.

A husband who could barter with another for the despoiling of his wife's virtue, and stand by to witness it with his brother, and remain passive and silent while such object was obtained by violence, and then use such permitted and encouraged rape to divorce her from him, and by this, and perjury added, publish her to the world as an adulteress, is morally guilty of as foul a crime as can be named in the calendar. The offense of Reagan, heinous as it is, sinks into insignificance beside it.

To hold the respondent guiltless of rape would deprive him of the punishment he richly deserves, if the story of his wife can be believed. There is no adequate punishment for such a crime as his unless he can be held as a principal with Reagan. And the law will support his conviction upon the facts which the jury must have found to be true.

It is said by the supreme court of Iowa in one of the cases cited in the brief of the counsel for respondent (State v. Farr, 33 Iowa, 561):

"If it had been preconcerted between A. J. Farr and the defendant to go to the mill for the purpose of drawing Graham, the deceased, into a quarrel, with a view of inflicting upon him some bodily injury, and the killing had resulted in pursuance of such a plan, then the defendant would have been alike guilty with A. J., the perpetrator of the deed."

On the trial of Charles, Lord Mohun, before the House of Lords in the year 1692 (12 How. St. Trials, 949, case 371), for the murder of William Mountford, this question was submitted to the judges:

"Whether a person, knowing of the design of another to lie in wait to assault a third man, *who happened to be killed* when the person who knew of the design is present, be guilty in law of the same crime with the party who had the design and killed, though he had no actual hand in his death."

Lord Chief Justice Holt answered for the judges:

"My Lords, I am of opinion this is no murder or manslaughter. He that knew of the design of assaulting, *only happened to be present* when the assault was made and the party killed; but, if he did not contribute to his death, he is not guilty of murder; * * * but if the person that knew of this design *did advise it, or agree to it, or lay in wait for it, or resolved to meet the third person that was killed, it would be murder.*"

See, also, 1 Bish. Crim. Law (7th ed.), §§ 636, 641; 1 Russ. Cr. (9th ed.) 54, 55; 1 Whart. Crim. Law (7th ed.), § 116; 2 Hawk. P. C. p. 443, § 10; Id. p. 441, § 7; *U. S. v. Ross*, 1 Gall. 624; 1 East, P. C. 258; 1 Hale, P. C. 441; *Com. v. Campbell*, 7 Allen, 541–543; *Thompson v. State*, 30 Ala. 28; *Brennan v. People*, 15 Ill. 511.

Bishop lays down the rule, in his view, thus:

"Every man is responsible criminally for what of wrong flows directly from his corrupt intentions; but no man intending wrong is responsible for an independent act of wrong committed by another. If one person sets in motion the physical power of another person, the former is criminally guilty for its results. If he contemplated the result, he is answerable, though it is produced in a manner he did not contemplate."

The result aimed at by the respondent was sexual inter-course between Reagan and his wife, and the evidence of it, for his use in a divorce suit. His bargain with Reagan was to fix it so that he could catch Reagan " in bed with or aboard of her." He was not particular in his agreement how this was to be accomplished,—whether by force or his wife's full consent. He stood by and saw the force used. It is evident he sanctioned it, and, under the circumstances, this sanction was an encouragement and assistance to Reagan. The result bargained for was attained by his corrupt agreement in the first instance, and by his presence and sanction of the evil act. If he had not been present at all, I think he would have been guilty, as the result was desired and profited by, though it might have been accomplished by force when he intended it should be obtained without it. Not only was he present, but, by his silence and passiveness when his wife was defending her honor, and his conduct when he rushed into the room and afterwards, the irresistible conviction is forced upon my mind that the purpose of his agreement with Reagan, and the object of his presence in the house, were to obtain evidence of the sexual intercourse of his wife with another than himself, and that he cared not how such inter-course was obtained. I am reasoning now upon the evidence of the wife and Reagan ; and, if their testimony be true, of which I am not to judge, the respondent is guilty as charged, under every principle of law as well as morals.

The court correctly charged the jury—

" That if they found beyond a reasonable doubt that there was an agreement between Chapman and Reagan that Reagan should be caught by Jerry Chapman in bed with Mrs. Chapman, or on board of her, as the witness Reagan puts it, and in pursuance of that agreement Reagan com-mitted the crime of rape upon Mrs. Chapman, and Jerry Chapman, the defendant, was present in an adjoining room, in pursuance of that agreement, with the door partly open, and witnessed and sanctioned the act of rape when it was committed, then the defendant was guilty of rape."

And the question of the worth and reliability of Reagan's testimony was submitted to the jury by the court in as strong

language as the defendant could, under the law, reasonably desire. The circuit judge said :

"A man who acknowledges that he is guilty of a crime of this kind, and by his testimony implicates others in the crime, is not entitled to credit as an ordinary witness, when placed upon the stand as a witness. A witness who admits that he has been guilty of a crime of this kind, for the consideration of twenty-five dollars, is a bad and dangerous man, and his testimony should be carefully scrutinized. A witness who states that he has committed perjury for the purpose of shielding himself is a dangerous witness. The testimony of a witness who has willfully sworn falsely in regard to a material matter in the case may be utterly disregarded by the jury."

We have carefully examined the record, and find no injustice done the defendant upon the trial by the rulings upon the admission of evidence, or the charge of the court. If he has been wronged, it was by the action of the jury, who heard not only all the testimony we have before us, but who had the opportunity, denied to us, of seeing the witnesses, and watching and weighing their conduct and appearance upon the stand. We cannot interfere with their judgment, though from the record we might have doubts of his guilt.

A serious difficulty arises, however, when we consider the manner of the preliminary examination of the accused upon which he was held to trial in the circuit.

It appears without any contradiction that during the examination of the respondent, and at its close, before Irving T. Wood, a justice of the peace, residing in Brownstown, the depositions of the witnesses were not subscribed by them. The depositions so taken by the justice were returned by him to the circuit court without signing by the witnesses, or the reading of their testimony to them. The examination closed January 15, 1884, and the return was filed in the county clerk's office January 24, 1884. The defect was discovered by the prosecuting attorney sometime in March, 1884, when the depositions were taken by the sheriff to the justice, and some of the witnesses seen at their homes and other places, and their signatures procured to their deposi-

tions, but without reading their testimony, or having it read to them. The justice attached his jurat, certifying that the same was sworn to and subscribed on the fifteenth day of January, 1884. No oath was administered to any of them at the time of signing. Among those whose signatures were thus obtained was Maggie Chapman, defendant's wife, without whose testimony the defendant could not have been held to trial, as Reagan upon the examination testified, in harmony with the theory of the defendant, that his wife was willing.

In the circuit court the defendant stood mute, and refused to plead, and a plea of "not guilty" was entered by order of the court.

During the trial, upon a showing of the facts above stated, the defendant's counsel moved to quash the information upon the ground that there had been no preliminary examination as required by statute, and no waiver of the same.

It was held in *People v. Smith*, 25 Mich. 497, that, unless the depositions were signed by the witnesses as required by the statute, they were essentially defective, and that they stood without authentication, and, as a basis for the information and other proceedings, were mere hearsay.

The information was not filed in this cause until after the depositions had been signed by the witnesses, and returned to the clerk's office by the justice. In this only does it differ from *People v. Smith*. In that case the depositions were unsigned when the information was filed, and at the time of trial and conviction of the accused.

The statute does not, in express terms, require the depositions taken down by the magistrate upon the examination to be read over to the witnesses before signing, but such is the common practice, and should be required. How. Stat. § 9469.

If the language of the witness, as taken by the magistrate, is not read to the witness, or by him, before signing, for the purpose of correction, there can be no certainty that the deposition of the witness so written and signed is as it was actually stated under oath.

The imperfect hearing or understanding, which is always liable to exist when one is transmitting or transcribing the language of another, may change entirely the character of the evidence ; and the general inclination to abbreviate what is said, by the writer's undertaking to convey the same meaning in less words, may ofttimes change the sense unintentionally. The object to be served by an examination would perhaps be defeated if the witness is not only permitted, but required, to know before signing what the magistrate has written. Without it there could scarcely be a conviction for perjury if the witness, upon the trial, should see fit to materially change his testimony, as Reagan did in this case.

But, besides this, the defect is radical in this case. The defendant was held to trial without any preliminary examination under the statute. We do not mean to hold that the neglect to have one or more witnesses sign their depositions would void an examination, provided there was sufficient testimony to bind him over from witnesses who had subscribed their depositions. But here Chapman could not have been held if the testimony of his wife had been expunged from the record, as Reagan upon examination swore that his intercourse with her was by her consent. Nor do we think, after the justice had made his return, in January, to the circuit, that he was authorized to procure the signatures of the witnesses in March afterwards.

His jurisdiction over the case was ended, and he had no more business in amending the return than a private individual : *Foster v. Alden*, 21 Mich. 508 ; *Hamilton v. People*, 29 Id. 176.

It follows that the conviction must be set aside, and the respondent discharged from custody.

CAMPBELL, C. J., and CHAMPLIN, J., concurred.

SHERWOOD, J. (*dissenting*). In this case, for a single alleged error in the proceedings preliminary to the arraignment, trial, and conviction of the defendant, my brethren.

have decided to amend the sentence, and discharge the prisoner from the penitentiary.

In this result neither my sense of justice nor my understanding of the law will allow me to concur.

In my judgment, a case seldom occurs in a civilized community showing more depravity in the accused, or a greater outrage to common decency and public morals. It is hard to conceive of an act more cruel, or conduct more flagrant and injurious, to the young wife, whose person, pride, and chastity were violated and mangled, and whose hope, happiness, and life have been essentially destroyed, than was perpetrated by the villainous defendant, who is now pleading for the advantage which he has been led to believe a technical construction and application of the law gives him in avoiding the just penalty for his crime. I can never bring my mind to consent to or sanction such a consummation.

The law provides for and requires justice to be done between the parties, in both civil and criminal cases, and when injustice is done, either to the prisoner or the State, it is not the fault of the law, but of those to whose care, prudence, and judgment its administration has been intrusted. There is no injury, civil or criminal, for which the law, when properly applied, will not furnish some mode of redress.

The common law is the source of those great elementary principles which must ever form the staple of American jurisprudence, and our state legislatures have provided that its defects may be remedied, and its provisions modified and supplemented, to meet the ever-changing circumstances and needs of the wants and necessities of an advancing civilization.

When, however, the law has been given and published by the law-making power, the Legislature has discharged its whole duty. It is then left to the courts to construe and apply it in each particular case as the circumstances may require to secure equity and justice between the parties, and any construction which will defeat the scope and operation of the law, so as to fail to secure the object intended, is a

perversion of the law, and usually operates a miscarriage of justice.

Many general rules have been made and adopted by courts for the proper administration of the law, but none have yet been found so perfect as to cover every case. These rules emanate from the court, and have ever been regarded as flexible ; and, while they may be applied in most cases with satisfactory results, there are cases, with their varying circumstances, constantly arising, to which they are entirely inapplicable. In such cases the particular circumstances of each, and the treatment they require' to secure the ends of justice, must be allowed to govern. In such cases analogy fails to furnish the precedent ; but, if the court has jurisdiction, the power is inherent in the court to apply the proper remedy to secure the ends of justice, and, in my judgment, it is its duty to do so.

This doctrine is not new. It is as old as human law itself. And from time immemorial courts have found themselves compelled, in securing the rights of parties, even upon questions involving the merits of cases, to overrule and condemn as unworthy and inadequate the rule laid down in previous decisions. To hold otherwise would be to proclaim the infallibility of human judgment.

I do not forget this Court is intrusted with appellate powers only in this class of cases, and we can deal with the facts only so far as is necessary to make a correct application of the law ; but to that extent we must and should consider them ; and when they appear fully in the record, whether from an inspection of the testimony returned or from the findings of the court or jury at the circuit, they should be reasonably considered when the law is to be applied. There is no difference between law and equity in this regard, and equitable construction should always be given.

It is such considerations that led courts of last resort to adopt that most salutary rule, that error without prejudice should not be allowed to control. It is the failure to properly observe this rule in such courts which, in my judgment, has been the occasion of more injustice than any other, and

has done more to bring into disrepute the administration of justice, as it now obtains in this country, than all things else which can be alleged against it.

Entertaining these views, I propose to examine for a few moments this case, wherein I have felt it my duty to differ with my brethren.

We fully agree as to the atrociousness of the act of this respondent complained of, and I do not feel called upon to spend any time in argument, or in the examination of authorities, either English or American, to convince myself, or anybody else, that the act charged against the respondent is a crime of the most revolting nature. No reasoning is required upon that subject. Any person who has understanding sufficient to know that it is his duty to love and respect his mother will not at once fail to stamp the wicked act of the respondent as one of the blackest in the criminal catalogue.

The evidence shows that the respondent, in 1881, became acquainted with this young girl, then a mere child not yet fourteen years of age, seized upon her affections, secured her confidence, and in this matter got control of her person,—debauched and seduced her,—and a short time before she was to be delivered of a child, evidently to avoid the perils then threatening him, induced her to falsify her age and marry him, and after living with her about ten months became weary of her, and, for the purpose of giving him some pretext for putting her away and obtaining a divorce, introduced into his house and home, as a boarder, an admitted vagabond and perjurer, whom he hired for $25 to commit the abominable crime of rape upon this young wife, while he, accompanied by his brother, occupied an adjoining room, where the two could listen to her outcry of distress while the fiendish act was being perpetrated, and witness the frantic struggles of the injured girl in her contest and efforts to resist the beastly creature who had thus been procured by the respondent for the wicked service, and who is now incarcerated in prison paying the penalty the law has meted out to him for his crime.

It is for the defendant's participation in this diabolical act

that he was arrested, tried, convicted, and sentenced to State's prison for seven years.

I agree with my Brother Morse that "the law will support the conviction upon the facts which the jury must have found to be true," and which, if true, "the respondent is guilty as charged under every principle of law, as well as morals ;" and I further agree with him where he says : "We have carefully examined the record, and can find no injustice done the defendant upon the trial by the rulings upon the admission of evidence, or the charge of the court." But, if this be all true, why should the culprit prisoner be discharged ? He has never, as the record shows, when called upon by the court to say whether he was guilty or not, denied the charge of crime.

No reason is given, or can be given, I apprehend, why he should be discharged, except that the testimony taken upon the examination of the respondent before the examining magistrate was not signed by the witnesses at the time the testimony was taken, but afterwards. There is no showing that the testimony was not all sworn to, or not taken under oath and in presence of the justice, nor that the testimony itself was wrong or incorrectly taken.

The principal objects for making a preliminary examination are—

1. To enable the magistrate to ascertain whether the offense charged in the warrant, or any other offense, has been committed, and, if so, to determine whether there is probable cause to believe the person charged committed the crime.

2. That the prosecuting attorney may have something to guide him in determining the character of the offense he will charge against the prisoner in the information before the traverse jury.

In regard to the first object, it was fully accomplished in this case; for the witnesses were sworn, and their testimony all taken down, in the presence of the accused, and heard by the magistrate ; and, had the witnesses all signed their depositions before leaving the justice's office, it would not have helped him in the discharge of his duty.

With respect to the second object, so far as the aid to be furnished to the prosecuting attorney in drafting the information and preparing the case for trial, the signatures of the witnesses to the depositions at the time the witnesses were examined could not have aided him in the least. He was present at the examination, and had the signatures to the depositions before the respondent was arraigned. Certainly it would appear that both objects of the statute requiring the signatures of the witnesses to their depositions were fully accomplished.

In this connection it will be noticed that the statute does not require the depositions to be read to the witnesses; nor is there any particular time designated when the signing shall be done, except that fair construction would require that it be done before the return is made by the magistrate. The act is a clerical one at most, and I think any court would allow it to be done any time on motion made for that purpose. I cannot understand how such a defect can be held jurisdictional. It will be recollected it was not one of the affidavits necessary to cause defendant's arrest or detention, but testimony taken under oath, in the form of a deposition, which the witness had omitted to sign,—testimony which might or might not be necessary to use in the case in the circuit; and, as the fact turned out upon the trial, but two of these affidavits were referred to, and each time for the defendant, and were given the same force and effect as if no irregularity had occurred in the signing. Nothing can be clearer to my mind than that the alleged defect in the proceedings in this regard, if erroneous, was entirely harmless and without prejudice to the defendant.

But there is still another reason why I think we should not open the prison door to this vile convict.

From the beginning to the end of the proceedings against him which ended in his incarceration, he had learned and ingenious counsel to aid him in making his defense, and at no time does he appear to have been without friends in his efforts to elude the justice of the law, and it does not appear, in all the preliminary proceedings had, he objected to any-

thing, but sat quietly by, evidently waiting and watching for some error that might occur in the people's proceedings which would furnish him with some technical objection to serve his purpose; but the one now made does not appear to have been urged in any of those proceedings.

Upon the arraignment of the respondent in the circuit court he was asked to plead. This he declined to do, and nothing was then said of any want of preliminary examination; and, so far as the record shows, no such error as is now claimed was then thought of by the respondent or his counsel, and not until the trial had opened, and a witness was being examined, was the present expedient resorted to. The objection then came too late, and ought not to prevail. The proper time to make such defense was when he was arraigned and requested to plead. If any material matter had then been found to have been omitted, or mistake made, the remedy could have been applied without releasing the prisoner from the penalties of his terrible crime. I think the prisoner, under the circumstances as they appear in this case, should be held to have waived the error upon which he now relies.

This is not the case of *People v. Smith*, 25 Mich. 497. There the testimony was not signed by the witnesses when the information was filed, and the motion to quash was made when the respondent was asked to plead. *Washburn v. People*, 10 Mich. 372; *Morrissey v. People*, 11 Id. 343; *People v. Jones*, 24 Id. 219; *Hamilton v. People*, 29 Id. 177.

But I am entirely satisfied in placing my dissent in this case upon the ground that, if the omission claimed is error, it is harmless and without prejudice, and the judgment of the circuit court should not be disturbed.