THE STATE v. FRANK (SONNY) McDANIEL, Appellant.—80 S. W. (2d) 185.

Division Two, March 5, 1935.

*Fred Stewart* and *Leonard Walker* for appellant.

*Roy McKittrick*, Attorney General, and *Chas. M. Howell, Jr.*, Assistant Attorney General, for respondent.

ELLISON, J.—The appellant, a negro twenty-eight years old, was convicted of murder in the first degree in the Greene County Circuit Court and his punishment assessed by a jury at death. The charge was that he shot with a pistol and killed his paramour, a negress named Savilla "Billie" Scott.. His defense on the facts was an alibi. In his brief on this appeal, and in his motion for new trial in the circuit court, errors are assigned: (1) in the transcript of the proceedings at the preliminary hearing in justice court, which was filed in the circuit court as a basis for the prosecution; (2) because the circuit court permitted the filing of an amended transcript and an amended information; (3) in the admission of certain evidence offered by the State; (4) and on the grounds that the verdict was against the weight of the evidence and unsupported by substantial, credible evidence.

Appellant had served one term in the State penitentiary for burglary and larceny and another in the Federal penitentiary at Leavenworth for some violation of the liquor laws. At and for some time prior to the date of the homicide he was unemployed, and the evidence indicates he spent most of his time loafing at a pool hall.

660

The deceased Savilla Scott was working as an elevator girl at a department store in Springfield. She and the appellant had been living together for about nine months prior to her death. He declared they got along together very well barring occasional minor spats and quarrels. But there was testimony for the State that the two had been having trouble for a long time over the appellant's attentions to other women. Answering a question on cross-examination as to whether he had not given the deceased a black eye two or three weeks before the homicide, he answered, "I didn't black her eye; I smacked her." There was a negro dance in Springfield the night before the night of the homicide. Three witnesses for the State testified that the appellant and the deceased attended this dance but that he went home without her. She followed later with her sister and her sister's husband, was crying, and started to take down the curtains in her bedroom with the announced intention of moving to some other abode. These witnesses testified the appellant said to "let her go; he didn't give a damn." The appellant admitted on cross-examination that the deceased did take down the curtains, but he said "she didn't leave."

The body of the deceased was found at the side of a country road about seven miles south of Springfield in Greene County early in the morning of March 29, 1933, by some farmers of the vicinity. The road was a dirt road running north and south parallel to and about a mile east of a main road known as the south Campbell Street road. About one-eighth mile south of the place where the body was discovered a crossroad extends west from the dirt road to the Campbell Street road, and it seems there were other east and west crossroads connecting the two highways within two miles north of that point.

Dr. Fulton, a neighboring physician, was called by the farmers who came upon the corpse. He summoned the coroner, Judge Ambarger, and the latter brought with him Dr. Murray C. Stone. They arrived within about two hours, around eight o'clock in the morning. In the meantime the body had remained under the observation of several persons, who testified at the trial, in the same condition and position as when discovered. Dr. Stone took four photographs on the spot, which were admitted in evidence over appellant's objection. By these, in connection with his testimony and that of several other witnesses who had viewed the scene, it was shown that there were two fresh automobile tracks along the east side of the road. The body lay across these and five or six feet north of it the tracks were ground deeper into the dirt, as if by the spinning of the wheels of the automobile. The ground was too hard to retain the impression of footprints. None were found, and while other automobile tracks could be seen, they were further to the west in the traveled portion of the road or beyond, and did not appear to be fresh.

The woman's clothing was not disarranged. Her hat was still on her head. She lay almost front downward, but rested a little more on the left side with the left check on the ground and the face to the south. She had been shot five times with a revolver of large caliber. One bullet had passed clear through the right thigh, ranging downward and striking the femur. It was still in the clothing. Four bullets had penetrated the skull, all within a small space about the right ear and temple—the side of the head which was up as the body lay on the ground. Two of the bullets had entered through the same hole making it larger. All four passed entirely through the brain and were extracted at a post-mortem, and admitted in evidence without objection. A large pool of blood covered the ground immediately under the head and blood and brain substance had spattered to a distance of several feet. Unburned grains of powder were found in the hat.

It was Dr. Stone's opinion that the woman had been dead several hours; that the bullets penetrating the brain had caused instant death; and that the revolver had been fired into the head at close range as she lay on the ground. He explained that the brain substance had probably been forced out and scattered to a considerable distance by the bullet which passed through the hole previously made by another bullet. He said there would not have been so much blood on the ground if the woman had been killed elsewhere and brought there; and that the blood and brain substance would not have scattered to such a distance merely from the hurling of the body out of a moving car. That this was not done also seems apparent from the position of the body and the fact that the clothing was not disarranged. The conclusion drawn by Dr. Stone and the other eyewitnesses from the circumstance that the body lay across the fresh automobile tracks a few feet south of the scooped out places therein, was that the automobile which made the tracks had stopped while headed north; that the woman and the murderer had gone around behind it where she was shot and fell across the tracks, and the spinning of the back wheels in hurriedly starting the car forward had caused the deeper marks in the road.

The appellant was picked up by the sheriff at a pool hall the morning after the homicide. He said he did not know Savilla Scott had been killed, and declared he had been at home all evening and all night. He also denied owning or having a pistol of large caliber. He testified at the coroner's inquest and his story there was about the same. He said he called for the deceased at the store where she worked about noon on the day of the homicide and took her home. She prepared dinner, and after the meal he went back to the pool hall about two o'clock and remained until six, when he returned to his home. The deceased was there but they did not eat supper. About

eight o'clock she dressed and said she was going out and would be back after a while. About nine-thirty he put his car in the garage on the premises and went to bed. He said he was alone all that evening and night except that a man named Edward Warren came by and sat a while; and that occasionally the deceased would stay away from home all night. He declared he never owned or carried a .45 caliber pistol in his life.

But the man Edward Warren, instead of corroborating appellant's story, proved to be the State's main witness. He was a negro twenty-two years old and had been convicted once of petit larceny. He testified at the coroner's inquest, at the preliminary hearing, and at the trial. He said he attended a picture show with the appellant the afternoon before the homicide and accompanied him to his home that evening about six o'clock. He went out on an errand for appellant and purchased some cigarettes and matches. After delivering these he went to the home of Lillie Williams to telephone his girl, Lacerine Avery. From there he returned to the defendant's home and borrowed the latter's automobile. He brought the car back about nine o'clock. He fixed the time by the fact that a negro orchestra was broadcasting on the radio at Springfield that night between eight-thirty and nine o'clock, and shortly after the broadcasting he returned the car. He found appellant at home, alone. They drove to Grimm's Rib Station for a sandwich. There they met and took to their homes two negro women, Eveylyn Diemer and the appellant's aunt, Mrs. Jessie Wallace. The appellant then started to drive the witness to his home, but near the Benton Avenue viaduct they passed the deceased, Savilla Scott, on the street. The appellant invited her to get in the car, saying he would take her home after he had delivered the witness.

Warren's home was southeast but appellant drove west. The witness called his attention to the fact and appellant said, "I will take you home when I get ready, you are not liable to get home." He turned south and drove out of Springfield on the Campbell Street road for "several miles," and thence turned to the right or west for quite a distance, maybe one or one and one-half miles. Then he turned to the left, or south, and after going about one or one and one-half miles stopped the car, lit a cigarette and announced he had gone out there to kill the deceased. She protested and asked why he wanted to kill her, and he said, "Because you did me dirty." Then he sat for a while with his head down and said, "Well, I guess I won't." Then he drove about one-half mile further south, and turned to the left or east, for about one or one and one-half miles, and again made a left turn to the north. When he had gone about one-half mile he stopped the car and made the witness and Savilla Scott get out of the car.

He directed the witness to go to the front of the car, and took the deceased behind it. She pleaded with the appellant not to kill her. The witness went back to protest, when the appellant ordered him to return to the front of the car or he would kill him. The witness did so and in just a short time heard four or five shots close together. The appellant said, "Little girl you are just another little girl gone." Then he came to where the witness was in front of the car and said, "I am a good mind to kill you." The witness protested and the appellant said, "I won't kill you if you promise not to tell anything about it. If you tell anything, I don't have to be on the outside to kill you, there will be somebody on the outside to do it." The appellant then brought Warren back to his own home and ordered him into the house. They arrived about midnight. The two occupied the same bed, but the witness said, "I never slept none that night at all." The next morning when the two got up the witness waited until the appellant was ready to go. The appellant drove him up into town and let him out.

Warren's statement that he went to the home of Lillie Williams to telephone early in the evening of the homicide was corroborated by her. Also the woman Eveylyn Diemer confirmed his testimony that he and the appellant met her and appellant's aunt, Jessie Wallace, at Grimm's Rib Station that night and drove them home in appellant's car. She fixed the time of the meeting as about ten forty-five.

The State produced three other witnesses who testified concerning the movements of the appellant the evening of the homicide. Oscar Greer, a negro in jail at the time of the trial on a burglary and larceny charge, said he went by the appellant's house about nine-fifteen that night. The appellant and witness Warren were just driving away. Greer called to them and the appellant told him to go on home and go to bed. Greer went back to Grimm's Rib Station and there learned that appellant and Warren had just left. Also, Albert Jones and his wife said they went to the appellant's house about eight-thirty P. M. and remained about an hour. When they arrived the defendant was in the back yard and another negro was with him. An automobile resembling the one owned by appellant was in the yard. A few minutes later they heard the automobile drive away and they did not see the other negro any more. The appellant and the deceased were at home during the entire time of their visit. A man named Elmer Doran came just before they left. Doran was not produced as a witness by either side.

It will be remembered the appellant testified at the coroner's inquest that he had never owned or had in his possession a .45-caliber pistol. The witness Oscar Greer said that on New Year's Eve 1932-3, less than three months before the homicide, the appellant had an old looking .45-caliber revolver which he fired during the celebrat-

ing. Greer also reluctantly testified that the appellant carried this revolver for some time after that. Howard England, a negro nineteen years old, swore he sold the appellant a .45-caliber Colt's revolver for $3 about Christmas, 1932. It was a six-shooter. On cross-examination it was shown that this witness had been convicted of burglary and larceny twice and that he was in jail serving a sentence for the second of these offenses at the time of the trial. He said a man named Spencer told him he would be benefited if he would testify that way. Udell Abernathy corroborated the testimony of the witness England this far. He said England owned a .45-caliber pistol about Christmas time, 1932; that he loaned him money on it and that the witness reclaimed it close to the first of the year, 1933.

Arthur Lee Bond, who had previously been convicted for disturbance of the peace, and who, at the time of the trial in June, 1933, was in jail on a grand larceny charge, said that in about April, 1933, he had visited the witness Howard England at the jail where the latter was confined and there saw the appellant. The appellant asked him to take a message to a ''boy;'' that he wanted this boy to take the witness Warren ''for a ride.''

As at the coroner's inquest, the appellant also swore at the trial in the circuit court that Savilla Scott left his home about eight o'clock the evening of the homicide, saying she would be back after a while; that she stayed away all night; and that he slept at home alone and did not learn of the killing until the next morning. But in the important particulars his story in the circuit court differed from what he had said at the inquest. Before the coroner he declared he had remained at home all evening without leaving the premises, and having only one caller, the State's witness Warren. But at the trial he admitted going to Grimm's Rib Station, with Warren and picking up and taking home the Diemer woman and his aunt, Mrs. Jessie Wallace. He said he then let Warren out of the car on the way back to his own home, where he arrived and retired about eleven o'clock. He further testified that later that night a man named Curley Yadon came to his house to buy some beer. He insisted he had told at the coroner's inquest about his trip to Grimm's Rib Station and meeting the two women, notwithstanding the transcript of his testimony did not show it and the authenticity thereof was not questioned by his attorney, but he admitted he said nothing there about Yadon's nocturnal visit to his home for beer. Appellant did not testify at the trial about owning (or not owning) the .45-caliber pistol, or about the visit of Albert and Mrs. Jones to his home the night of the homicide. He denied being with the witness Warren in the afternoon, and that the latter slept at his house that night.

Allott W. Yadon, the man referred to by the appellant as ''Curly'' was a student twenty-one years old attending the Teachers' College

at Springfield. He corroborated the appellant, saying he went to the appellant's home about eleven thirty the night of the homicide to buy some beer. He knocked twice before he aroused the appellant, who finally came to the door in his pajamas, yawning and stretching. No one else was there. Yadon testified he had been to a picture show that night with a girl whose name he did not know and after leaving her on the street he decided he wanted a sandwich and some beer. He read in the newspaper about appellant's arrest on the murder charge the day after the homicide, and told appellant's attorney the next day about his visit to appellant's home, though not knowing the lawyer represented the appellant.

Sherman McDaniel, an uncle of the appellant, testified he passed appellant on the street in Springfield about five forty-five the afternoon preceding the homicide. Both were driving cars. The appellant was alone. The coroner, Judge Ambarger, testified that among the papers found on the body of the deceased was an undated, unsigned note saying, "Come to 211 South Hampton tonight." The handwriting of one of the persons living at that address resembled the handwriting in the note. Rev. J. E. Henderson testified that he was at the undertaking shop the morning after the homicide shortly after the remains of Savilla Scott were brought in. Edward Warren was there and said, in answer to a question, he did not know who did the killing. Later that morning Warren told him he had heard that the appellant McDaniels did it.

Clarence Neese testified that some time after nine o'clock the evening of the homicide he saw Savilla Scott near the Benton Avenue viaduct. He had known her quite a while and she spoke to him. A little after that a black closed-in car drove up and stopped (appellant's car was a Chevrolet roadster, an open car). A negro man got out and assisted the deceased into the car. The man was not the appellant. There is nothing in the record tending to impeach the character or credibility of this witness.

Fitting in with the testimony of the witness Neese, last mentioned, is that of Mrs. Lena Todd. At the time of the trial she had moved to Miller County, but on the date of the homicide she was working at Tombro's filling station located on the Campbell Street road at its intersection with the crossroad connecting with the dirt road on which the homicide was committed about one-eighth mile south of the point where the body was found. In other words the filling station was about one mile west and one-eighth mile south of the scene of the murder. The witness said she was closing up the filling station a little before ten o'clock at night when she heard five gun shots (supposedly coming from the east though she did not expressly say so). In about six minutes a black closed-in Chevrolet car, either a sedan or coach, came from the east. It slowed up as if to

stop at the filling station but did not stop, and turned north on the Campbell Street road continuing on toward Springfield. There were two negroes in the car. The one on the right acted scared. He was a large man and had on a black suit and dark hat. The witness was not asked by counsel on either side whether the two negroes she saw in the car did or did not resemble the appellant or Warren. Apparently in an effort to contradict the testimony of this witness the State asked three or four witnesses who lived closer to the scene of the homicide than the filling station whether they heard any pistol shots that night and they all said they did not. But we cannot see much value in this testimony. If it contradicts Mrs. Todd it is also contradictory of the State's own theory that the shooting occurred on the country road, because these witnesses from the neighborhood heard no shots at all.

Other facts will be noted as necessary in the course of the opinion.

I. In Article V, Chapter 29, Revised Statutes 1929, dealing with preliminary examinations before magistrates, Section 3480 provides that in all cases of homicide the evidence given by the several witnesses shall be reduced to writing by the magistrate, or under his direction, and shall be signed by the witnesses respectively. Section 3489 provides that all such written examinations shall be certified by the magistrate, and where the prisoner is committed to jail, they shall be transmitted to the jailer along with the warrant of commitment.

In this case the appellant was committed to jail. Only one witness, Edward Warren, was examined. His testimony was reduced to writing but was not subscribed by him, as required by Section 3480, and the transcript of his examination was not certified by the magistrate and transmitted to the jailer of Greene County with the warrant of commitment, as required by Section 3489. For these reasons the appellant filed a motion to quash the information when the case was called for trial in the circuit court about two months later. The court sustained the motion. Thereupon the magistrate obtained the signature of the witness Warren to the written report of his testimony, certified the same, and transmitted it to the jailer along with a new (it seems) warrant of commitment. He further filed in the circuit court an amended transcript of the proceedings at the preliminary hearing showing the above facts, and the prosecuting attorney filed an amended information substantially in the same form as the original. The circuit court record recites that the amended transcript was examined and found correct and that it was ordered filed and made a matter of record; and that the amended information was filed by leave of court. The appellant thereupon attacked the amended information by a motion to quash, on the same grounds

urged against the original. This motion was overruled. Appellant's first assignment of error complains of that ruling.

Appellant's contention, in substance, is that the failure of the magistrate to have the witness sign his written examination *at* the preliminary hearing, and his failure at that time to certify and transmit the same to the jailer with the original warrant of commitment invalidated the preliminary hearing; and that, in consequence, he (appellant) was forced to trial without a legal preliminary hearing in violation of Section 3503, Revised Statutes 1929. It is appellant's position that the magistrate lost jurisdiction of the cause when the preliminary hearing was concluded, and that he had no authority nearly two months thereafter to obtain the signature of the witness Warren to the written report of his testimony and to certify and transmit the same to the jailer.

Appellant has cited two Michigan cases which seem to sustain his contention. Under a statute of that state substantially like Section 3480, Revised Statutes 1929, one of these decisions, People v. Smith, 25 Mich. 497, holds that the unsigned written testimony of witnesses at a preliminary hearing may be likened to mere hearsay and cannot serve as a basis for a criminal prosecution by information. The other case, People v. Chapman, 62 Mich. 280, 288, 28 N. W. 896, 900, 4 Am. St. Rep. 857, 864, ruled that after a magistrate had reduced to writing the examinations of the witnesses at a preliminary hearing, but without requiring their signatures, and had certified them to the clerk of the trial court, he lost jurisdiction of the cause, and had no authority thereafter to procure the signatures of the witnesses and to refile the transcript. But there was a strong dissenting opinion which declared that the act of a magistrate in obtaining the signatures of witnesses was clerical, and not jurisdictional, and that the trial court should allow it to be done at any time on motion made for that purpose.

The decisions in this State are in line with the dissenting opinion in the Chapman case. State v. Smith (Mo.), 228 S. W. 1057, 1059, holds that the requirements of Sections 3480 and 3489 are not jurisdictional and may be waived. In that case a stipulation entered into by the State and the defendant agreeing that the testimony of the witnesses at the preliminary might be taken by a stenographer and a copy thereof delivered to each party, was construed by this court as making unnecessary the subscription of the transcripts by the witnesses and the certification thereof by the magistrate.

In State v. Ancell, 333 Mo. 26, 33, 62 S. W. (2d) 443, 446, the justice of the peace before whom a preliminary was held on March 26, certified a purported transcript of the proceedings (not including the testimony of the witnesses) to the circuit court six days later on April 1, but as a matter of fact he failed to make any original entries

of the proceedings on his docket until April 20, which was twenty-five days after the hearing, nineteen days after the date of his certificate, and ten days after his term of office as justice of the peace had expired. The testimony of the witnesses at the preliminary was taken in shorthand, and afterward transcribed. They did not sign the transcripts of their testimony before the aforesaid justice who conducted the preliminary hearing, and he did not certify thereto, but, on the contrary, they went before his successor in office and attached their signatures and he made the statutory certificates. Even under these facts, which certainly are extreme as compared with those in the instant case, this court held there had been a substantial compliance with the statutes and affirmed the conviction.

Appellant also cites two Missouri decisions, Norton v. Porter, 63 Mo. 345, and Smith v. Chapman, 71 Mo. 217. Both deal with appeals from a justice of the peace in civil cases. They hold, in substance, that a justice of the peace has no power on his own motion to make *nunc pro tunc* entries or to amend his docket without the consent of all parties, except under order of the circuit court pursuant to what is now Sec. 2349, R. S. Mo. 1929. The Smith case says an order of the circuit court directing an amendment of a magistrate's transcript sent up on appeal should distinctly specify the amendment; and that any amendment not directed by the order will be void.

Conceding these two decisions would be applicable to a transcript of a preliminary hearing in a criminal case sent up from the court of a justice of the peace, the record of the circuit court in the instant case recites that the court examined the transcript, found it correct and ordered it filed and made a matter of record. In our opinion this would be a sufficient compliance with Section 2349 if that statute is applicable. Furthermore, Section 3565, Revised Statutes 1929, provides that "upon the trial of any . . . information the court may at any stage of the proceeding, in furtherance of justice, amend or supply any pleading, writ, process, entry, return or other proceedings; and the court in which . . . the information (was) filed . . . may at any time before final disposition of the cause, . . . amend or supply any record in accordance with the fact." It was held in State v. Nichols, 330 Mo. 114, 127, 49 S. W. (2d) 14, 20, that this section authorizes the amendment of transcripts of preliminary hearings in criminal cases.

With reference to the requirement of Section 3489 that the written examinations of witnesses taken at a preliminary shall be certified by the magistrate to the jailer, where the prisoner is committed to jail: the provisions of the next succeeding section plainly show that the magistrate does not lose jurisdiction to make such certification after the preliminary hearing is concluded. Section 3490, Revised

Statutes 1929, provides that "if any magistrate refuse or neglect to certify and return, as required by the last section, any examination . . . by him taken, he may be required, by rule of court, forthwith to return the same, and in case of disobedience may be proceeded against by attachment." So, also, under Section 2349, supra, governing the return of transcripts by a justice of the peace on appeal in civil cases, it is held the circuit court may allow a justice of the peace to amend his transcript by certifying thereto. [Frick Co. v. Marshall, 86 Mo. App. 463, 469.]

As is stated in the Ancell case, supra, the purpose of a preliminary hearing from a defendant's standpoint, is to safeguard him from groundless prosecution; and this purpose is accomplished when the accused has been accorded a fair preliminary hearing, whether the examining magistrate makes a correct record of it or not. There is no contention in the instant case that the testimony of the witness Warren at ;the preliminary hearing was not correctly reported in the transcript returned by the magistrate. Appellant was present at the hearing and heard the testimony given. His counsel used the transcript for the purpose of cross-examination in the trial in the circuit court. Apparently the examination of the witness was taken down in shorthand and transcribed. At least such parts thereof as were read into the circuit court record by appellant's counsel were in the form of questions and answers. In harmony with the Smith and Ancell cases, supra, we are constrained to hold that the conviction of appellant should not be overturned on the unsubstantial grounds presented in this assignment of error, and that the circuit court did not err in overruling the appellant's motion to quash the amended information.

II. The next assignment of error is that the court erred in admitting in evidence the photographs of the body of the deceased Savilla Scott, taken by Dr. Stone as the corpse lay in the road. Appellant complains that the pictures were taken many hours after the homicide was committed; that he was not present or represented when they were taken; and that the exhibition thereof prejudiced and inflamed the minds of the jury without tending to establish his guilt.

The State's testimony indicates that the homicide was committed before midnight, perhaps nearer eleven o'clock. The body was found early the next morning by some neighboring farmers on their way to work. It remained undisturbed and under the observation of several of the witnesses until Dr. Stone took the pictures about eight o'clock. The testimony of Dr. Stone was that the position of the corpse, the fact that the clothing was not disarranged, the location of the bullet wounds, the great quantity of blood on the ground under the woman's head, and the widely scattered spots of blood and brain

substance, indicated she had received the fatal wounds in the head after she fell to the ground and lay as the remains were found. This certainly was sufficient to support an inference that the corpse was in the same position when the pictures were taken as when the homicide was committed.

Three photographs of the corpse about six inches long and four inches wide were taken. They have been brought up to this court as exhibits, along with the record. All of them show the body as it lay on the ground. One, Exhibit B, is a close-up view, the corpse being shown for almost the full length of the picture. On this one several dark stains extending downward across the face and forehead are discernible. Another, Exhibit C, is what might be called a semi-close-up, showing more of the surroundings. On this picture three circles are drawn in ink. Two of them are marked around small sticks lying crossed on the ground. Dr. Stone testified these sticks were placed by him to show where the automobile wheels had ground out the dirt. The third ink circle was intended to show the location of blood spots on the ground, but these are not discernible in the picture. Exhibit A is a picture of the corpse taken from a still greater distance and shows the road southward.

We think the photographs were competent and that the circuit court properly admitted them in evidence in connection with the testimony of Dr. Stone and several other witnesses. It was necessary for the State to prove the *corpus delicti* and the venue. The three photographs established the identity of the victim of the homicide and also had some tendency to show she had been murdered on the spot where she was found, in Greene County, and that the body had not been brought there from somewhere else. The State had only the one witness, Warren, by whom direct proof of the homicide could be made. Appellant's counsel presumably made a strong effort to discredit him in the trial court, as they have done in their brief in this court where they say his testimony "was the brain storm of an intimidated negro." The photographs tend to corroborate his story; to show the automobile was traveling north along the road; that the woman and her assassin went around behind the car; that she was shot and killed instantly on the spot; and that the automobile started up and continued on northward after the murder.

Appellant has cited several Missouri decisions such as State v. Porter, 276 Mo. 387, 396, 207 S. W. 774, 777, which hold that when there is no dispute about the facts upon which the exhibit would tend to throw light, the exhibition to the jury of gruesome evidence, such as the blood stained clothing of the deceased, is not justified, because it is calculated improperly to influence and inflame their minds. That is true, but it is also true that when there is a dispute about material facts upon which the exhibit would throw light, such evi-

dence is competent even though it may tend to agitate the feelings of the jurors. This whole subject was gone over at some length in the recent case of State v. Shawley, 334 Mo. 352, 369, 67 S. W. (2d) 74, 83, and the conclusion there reached was that, subject to the exercise of a wise discretion by the trial court on the particular facts, such evidence should not be excluded merely because it is likely to stir the emotions of the jurors unless the same showing can be equally well made by the State in some other way. In the instant case it is clear that the photographs helped the State's case and that the same showing could not have been made without them.

Furthermore the photographs exhibited to the jury in this case were not gruesome, any more than such pictures would always be. One does show what were probably blood stains across the face of the murdered woman, but we know this more from the testimony of the witnesses than from the picture itself. The wounds are not discernible. It has been held in several cases that photographs of the scene of a homicide including the body of the victim, or even of the body and the wounds thereon, are competent evidence. [State v. Clark, 99 Ore. 629, 662, 196 Pac. 360, 371; Olson v. Meachem (Cal. App.), 19 Pac. (2d) 527; State v. Eggleston, 161 Wash. 486, 297 Pac. 162, 82 A. L. R. 1439, 1443; 2 Wigmore on Evidence (2 Ed.), sec. 792, p. 93, note, sec. 1157, p. 682; annotations to Baustian v. Young, 152 Mo. 317, 53 S. W. 927, in 75 Am. St. Rep., pp. 477-8.]

As to the point made by appellant that he was not present or represented when the photographs were taken. This was not essential to make the photographs admissible.' [22 C. J., sec. 1123, p. 919.]

III. The court permitted the State to read to the jury a transcript of the testimony given by the appellant at the coroner's inquest, first overruling an objection by his counsel that the testimony was irregularly taken and that the appellant had not been sufficiently informed of his rights at the time. The objection was renewed as an assignment of error in the motion for new trial and is elaborated in appellant's brief on this appeal, where it is asserted: that he was not apprised at the inquest of his rights under the law; that he was not represented by counsel; and that he was under arrest when the testimony was taken. In support of this assignment two cases are cited: State v. Pearson (Mo.), 270 S. W. 347, 350, and State v. Smith (Mo.), 222 S. W. 455, 458.

The homicide was committed on March 28. The appellant was arrested by the sheriff the next day and detained in jail for investigation. The coroner's inquest was held on the day following, March 30. Presumably appellant was brought to it in custody of an officer since he was confined in jail at the time. He was not represented by coun-

sel. The transcript of his testimony shows that at the beginning of his examination the coroner made the following statement to the appellant and he gave the following answers:

"I want to make this statement to you at this time, that you are not compelled by the law to testify, or to make any statement whatsoever, if you think that such statement or testimony will incriminate you, or will tend to incriminate you in any criminal charge at all. You understand we are investigating the death of this young woman, and you have been called as a witness in the case, and we would like to have such facts you may or may not know, do you understand that? A. Yes, sir. Q. Will you give us the benefit of your testimony and such facts as you may know? A. Yes, sir."

The Pearson case cited by appellant, 270 S. W. 1. c. 350, quotes the following from the Smith case, supra, 222 S. W. 1. c. 458:

"In determining whether a statement of a defendant under such circumstances is admissible in evidence against him, the test is whether the statement is voluntary. [State v. Marion, 235 Mo. 1. c. 376, 138 S. W. 491; State v. Blackburn, 273 Mo. 1. c. 482, 201 S. W. 96; State v. Young, 119 Mo. 495, 24 S. W. 1038; State v. Thornton, 245 Mo. 1. c. 440, 150 S. W. 1048; State v. Miller, 264 Mo. 1. c. 450, 175 S. W. 191.] It may be gathered from those cases *that in every case where a defendant is subpoenaed and appears at a coroner's inquest or a preliminary hearing and testifies, his statement is not voluntary and therefore is not admissible against him.* The fact that he is under arrest, it appears, is not of itself sufficient to exclude his testimony as involuntary, but if the circumstances under which he is in custody are such as to show it was not entirely voluntary it should be excluded." (Italics ours.)

The foregoing verges on self-contradiction. At the beginning it says the test of admissibility is whether the defendant's statement is voluntary and at the end it says that even where the defendant is under arrest the *circumstances* under which he is held in custody must be consulted in determining whether his statement was entirely voluntary. But the part of the excerpt which we have italicized broadly declares that if the defendant is subpoenaed and testifies at a coroner's inquest or preliminary hearing, that fact alone makes his admissions involuntary and inadmissible as evidence for the State at his trial. In other words, if he was subpoenaed, even though he may have been represented by counsel at the inquest or preliminary hearing, even though he may have been fully advised of his rights and have understood them, still his statements cannot be shown against him.

If that be the law of Missouri, it must be conceded the trial court committed error against the appellant here in admitting the transcript in evidence. For, while the record does not show that he was subpoenaed to testify at the inquest, yet he was brought there in the

custody of an officer, which amounts to the same thing. But we think the italicized words do not correctly state the law, and that they are unsupported by the cases which the opinion cites, although two of the decisions may be thought to give some color thereto. Thus, State v. Young, 119 Mo. l. c. 521, 24 S. W. l. c. 1045, quotes the following from a Texas decision, which in turn credits it to People v. McMahon, 15 N. Y. 384; and the same language is quoted again in State v. Marion, 235 Mo. l. c. 376, 138 S. W. l. c. 496: "When a party is examined as a witness before a magistrate or coroner's inquest and is afterwards prosecuted for the same offense under investigation, his testimony, so taken, will not be received against him if, at the time of his examination, he was charged or suspected of the crime, and (that he?) was informed of the charge or suspicion against him."

The McMahon case from New York does so hold—substantially. But the opinion goes at great length to demonstrate that such testimony is excluded in the circumstances stated, not because of any right of immunity enjoyed by the witness, but because testimony given under stress of a judicial oath when the mind is agitated by a criminal charge is deemed too uncertain to be safely relied on. The law of Missouri does not proceed on that theory. Since 1877 the common-law rule has been abolished in this State and the defendant in a criminal prosecution is permitted, at his option, to testify as a witness in his own behalf. [Sec. 3692, R. S. 1929; Laws 1877, p. 356, sec. 1; State v. Clinton, 67 Mo. 380, 390.] And since 1879 the accused has been permitted at his request to testify at his preliminary hearing. [Sec. 1740, R. S. 1879; Sec. 3481, R. S. 1929.] It is hardly to be thought the law would permit the testimony to be received in these instances, if it were deemed too uncertain to be relied on because of the mental perturbation of the witness.

Contrary to the theory of the New York case, all the Missouri decisions hold that when such testimony is excluded it is in virtue of the defendant's right of immunity under Section 23, Article II of the Constitution of Missouri, which provides "that no person shall be compelled to testify against himself in a criminal cause;" and in conformity with the common-law maxim, "*nemo tenetur se ipsum accusare.*" It is a privilege which may be waived, and if the testimony be voluntarily given, it will thereafter be competent as evidence against the defendant. The Young case, supra, 119 Mo. l. c. 519, 24 S. W. l. c. 1045, says: "The great question after all is, was the statement voluntary? and it must be determined *from the facts in each case.*" (Italics ours.) So in each one of the decisions cited in the Smith case, supra, and, indeed, in the Smith and Pearson cases, themselves, it will be found that the court in determining whether the testimony given at the coroner's inquest (or grand jury hearing)

was voluntary, did not confine itself to an inquiry whether the defendant was subpoenaed to appear, and sworn to testify. On the contrary, in each case, the court consulted the particular facts before it: whether the defendant was ignorant; whether he had counsel; whether he was advised of his rights; whether coercive methods were employed in obtaining the statement from him, etc. And in State v. Miller, 264 Mo. l. c. 450, 175 S. W. l. c. 193, this court explicitly said: "The test as to the admissibility of this character of testimony is no longer whether it was made in a judicial proceeding under oath, but, was it voluntary? If so, then it is admissible, otherwise not." Such seems to be the law now in New York, People v. Chapleau, 121 N. Y. 266, 273, 24 N. E. 469, 471.

Applying that rule to the facts in the instant case. The appellant here was a negro twenty-eight years old. He had lived in the city of Springfield practically all his life. He had had experience with the law before; he had been once in the Missouri penitentiary and once in the Federal penitentiary at Leavenworth. His answers to questions at the coroner's inquest and when he testified in the circuit court indicate a reasonable degree of mental alertness. No contention was made by him or his counsel at the trial that he was induced to testify at the coroner's inquest by intimidation, persuasion or promises of any sort. The coroner informed him of his rights when the examination started. Appellant's counsel says in the brief on this appeal that appellant was ignorant and did not understand the meaning of the word "incriminate" in the statement made to him by the coroner. But that seems to be an afterthought of earnest counsel. No such claim was made at the trial. The only objection offered was that the coroner's statement, as made, did not sufficiently inform appellant of his rights. It might have gone a little further and told the defendant explicitly that any testimony he gave could be used against him. But it implied that. The appellant does not say he misunderstood, or that he was ignorant of his rights. We have no disposition to deprive him of his constitutional immunity against incriminating himself, especially when it is remembered that the punishment inflicted by the jury in this case was death. But on the facts we see no escape from holding that the trial court did not err in admitting in evidence the transcript of his testimony at the coroner's inquest.

IV. What has been said in the foregoing paragraphs sufficiently disposes of the contention of appellant's counsel that the conviction is unsupported by substantial credible evidence. Appellant's counsel assail the testimony of the witness Warren, and it is true there are some slight discrepancies between his testimony at the coroner's inquest and the preliminary hearing and his testimony at the trial in

the circuit court. But his story in the main was the same on all three occasions. It seems to conform to the physical facts. We have no doubt that a case was made for the jury. We find no error in the record proper, and having considered and disposed of all the points urged by appellant's counsel in the motion for new trial and brief, it results that the judgment and sentence of the circuit court must be and are affirmed. All concur.

Execution set for Friday, April 12, 1935.